KERR-COCHRAN, INCORPORATED, A NEBRASKA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57943.   Filed April 17, 1958.

*James D. Conway, Esq.*, for the petitioner.
*Richard C. McLaughlin, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in income tax of the petitioner as follows:

| Year | Deficiency |
|------|-----------|
| 1951 | $62,152.59 |
| 1952 | 43,518.38 |
| 1953 | 26,499.20 |

Certain issues in this case have been settled by agreement which may be reflected by a Rule 50 computation.  The two issues before us are (1) whether a warehouse constructed by the petitioner on leased land should be depreciated over the life of the building or amortized over the life of the lease; and (2) whether the petitioner was availed of during the taxable years for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner is a corporation which was organized under the laws of Nebraska on August 30, 1939, with its principal place of business in Hastings, Nebraska.  Petitioner's accrual income tax return for the calendar year 1951 was filed with the then collector of internal revenue for the district of Nebraska, and in 1952 and 1953 such returns were filed with the district director of internal revenue, Omaha, Nebraska.

Petitioner's articles of incorporation provide, in part, that the objects and purposes of the corporation shall be to purchase, sell, manufacture, exchange, or barter motor vehicles and all parts, ac-

cessories, and appurtenances thereto; to purchase, sell, etc., all merchandise relating to the automobile industry or not. The petitioner was also empowered to install and maintain a repair shop and to buy, hold, sell, and convey personal property and real estate and to deal in and dispose of same as may be necessary or convenient for the proper conduct of the affairs of the corporation.

Petitioner was organized by Claren R. Kerr, H. Max Cochran, and Homer N. Harsh. Of the 250 shares of $100-par common stock authorized, 200 shares were issued on September 2, 1939, as follows:

|  | Shares |
|---|---|
| Claren Kerr, Hastings, Nebraska | 72 |
| H. Max Cochran, Creston, Iowa | 72 |
| Andrew J. Harsh, Hastings, Nebraska | 20 |
| Harry Blosser, Creston, Iowa | 16 |
| Homer Harsh, Creston, Iowa | 20 |

A total amount of $25,000 was paid in at this time which was credited to capital accounts as follows:

| Capital stock (common) | $20,000 |
|---|---|
| Paid-in or capital surplus | 5,000 |

The petitioner engaged in various enterprises which included an automobile and truck business with a Chevrolet franchise, sales and servicing of farm equipment, wholesale and retail distribution of truck bodies and hoists, financing some of its sales, and construction, purchase, and operation of business buildings and farms. From August 1, 1943, through September 1, 1946, petitioner was not engaged in the automobile business but was active in other businesses such as finance, farm machinery, and wheat raising in South Dakota.

On August 1, 1943, pursuant to a decision of petitioner's directors, petitioner sold its merchandise inventory to Kerr-Cochran, Ltd., a partnership, and in effect went out of the automobile business. On August 30, 1946, the stockholders of petitioner voted to retire 127 shares of its common stock at its then book value of $281.28. On or about the same date, Claren Kerr sold 1 share of his stock to his brother, Lyle Kerr. Thereafter the stockholders of record and officers of the petitioner were as follows:

|  | Shares |
|---|---|
| Claren Kerr, president | 71 |
| Lyle Kerr, vice president | 1 |
| Andrew J. Harsh, secretary-treasurer | 1 |

These three have been officers and directors of the petitioner from August 30, 1946, to the date of this trial. On August 31, 1946, petitioner repurchased all of the assets and liabilities of Kerr-Cochran,

Ltd., at its net book value of $76,690.44 and was again in the automobile business.

On December 20, 1947, the directors of petitioner were authorized to issue to the stockholders of record 2 shares of common stock for each share outstanding. From that date to the date of this trial, the capital stock of the petitioner has been held as follows:

|  | *Shares* |
|---|---|
| Claren Kerr | 213 |
| Lyle Kerr | 3 |
| Andrew J. Harsh | 3 |
| Total | 219 |

### *Amortization Issue.*

In 1949 or 1950, the petitioner and three other automobile dealers in Hastings became interested in constructing a warehouse on land owned by the Chicago, Burlington & Quincy Railroad Company, hereinafter referred to as Burlington. The group was unable to get a loan for such construction because the building was to be constructed on leased land. The other three dealers refused to proceed with the project and petitioner proceeded to obtain a lease and to construct the warehouse with its own funds. The purpose for building the warehouse was to store automobiles and also to create a rental income-producing asset.

Petitioner wanted a 10-year lease but Burlington refused to grant a lease for any period longer than 5 years. On December 1, 1950, petitioner obtained a 5-year lease from Burlington. The lease provided, *inter alia*, that the nominal sum of $56 per year should be paid for the lease. It was further provided that any holding over by the lessee would create a tenancy at will, terminable without notice. There was also a section providing that upon the termination of the lease the lessee, if not in default, could remove from the premises all structures and properties not belonging to Burlington.

A long-term lease is defined by Burlington as one for any period longer than 3 years. Any such lease must be approved by Burlington's board of directors. When possible, it is the policy of Burlington to lease land on what is termed "a standard lease" which can be canceled by either party on 30 days' notice. Burlington's primary consideration in granting, renewing, extending, or canceling a lease is the amount of traffic and revenue produced for the railroad by the leased property. Petitioner's warehouse has been profitable for Burlington even though traffic is somewhat reduced since the Korean War ended.

At the expiration of the 5-year lease in 1955, petitioner requested a 5-year renewal but was refused. Burlington offered its standard

30-day lease instead. As of the date of the trial, petitioner continued to occupy the leased property without a renewed lease. No rent has been paid and no attempt has been made to remove the petitioner from the premises. Burlington has been ready and willing to enter into the standard 30-day lease since the expiration of the original lease.

The construction of the warehouse was begun in the fall of 1950 and completed in the summer of 1951 at an original cost of $146,404.23. In 1952 a sprinkler system and a firewall were added at a cost of $31,213.60, making the total cost of the warehouse $177,617.83.

The building was designed by Claren Kerr and constructed under his general supervision. The cost of construction was approximately $2.44 per square foot as opposed to approximately $5 to $5.50 per square foot, which was about the average cost of constructing a good warehouse at the time and place of this construction. The building was not properly designed or put together. The foundation walls, floor, and side walls were of insufficient thickness and strength. The roof was of roll roofing, which is the cheapest available. After 5 years of use, the floors and foundation were badly cracked, the walls were cracked and absorbing moisture, and the roof was wrinkled and would have to be replaced almost immediately.

Petitioner sought to amortize the cost of the warehouse over a 5-year period, or the period of the original lease. Respondent disallowed the amortization and determined that the warehouse should be depreciated over the life of the building which he fixed at 66⅔ years.

### Section 102 Liability.

Respondent also determined that petitioner was liable under section 102, I. R. C. 1939, stating the reason in his notice of deficiency as follows:

because you have accumulated profits beyond the reasonable needs of your business for the purpose of preventing the imposition of the surtax on your shareholders.

A notification was mailed to the petitioner in accordance with section 534 (b), I. R. C. 1954, on September 1, 1955. In accordance with section 534 (c), I. R. C. 1954, the petitioner submitted a timely statement to the respondent containing the grounds, together with some facts to show the bases thereof, upon which it relies to support the contention that the accumulation of profits was not beyond the reasonable needs of the business.

No cash dividends have been paid by the petitioner from the date of its incorporation through 1953. Petitioner's gross income, net

income, net income after taxes as reported on its tax returns for each of the years 1946–1953, inclusive, and its earned surplus as of December 31 of each of these years are as follows:

| Year | Gross income | Net income | Net income after taxes | Earned surplus as of Dec. 31 of each year |
|---|---|---|---|---|
| 1946 | $102,496.78 | $54,192.55 | $33,599.38 | $44,569.40 |
| 1947 | 341,377.89 | 171,787.59 | 106,652.46 | 136,621.86 |
| 1948 | 338,735.72 | 180,164.70 | 111,702.11 | 248,323.97 |
| 1949 | 361,436.36 | 195,312.17 | 121,093.54 | 369,417.51 |
| 1950 | 350,245.58 | 149,388.88 | 91,633.04 | 460,850.55 |
| 1951 | 425,142.87 | 166,140.81 | 87,924.84 | 544,985.37 |
| 1952 | 302,494.53 | 90,818.76 | 50,049.90 | 598,825.29 |
| 1953 | 229,889.80 | 44,835.64 | 28,757.89 | 627,583.18 |

The figures of net income after taxes for the years 1949 and 1950 do not reflect deficiencies in tax under section 102, which were determined in *Kerr-Cochran, Inc.*, T. C. Memo. 1955–90, affd. 253 F. 2d 121 (C. A. 8, 1958). Similarly, the figures of net income after taxes for the years 1951, 1952, and 1953 do not reflect the deficiencies in tax involved in the instant proceeding.

Petitioner's balance sheets as of December 31, 1951, 1952, and 1953, reflect the following assets and liabilities:

| | 1951 | 1952 | 1953 |
|---|---|---|---|
| **Assets:** | | | |
| Cash | $90,194.77 | $26,009.40 | $8,262.56 |
| Notes and accounts receivable (less reserve for bad debts) | 213,936.63 | 324,973.78 | 376,493.05 |
| Inventory (finished goods) | 146,032.30 | 103,713.62 | 110,959.48 |
| Other investments (securities) | 36,248.21 | 38,108.21 | 34,797.38 |
| Buildings | 80,000.00 | 83,712.83 | 80,000.00 |
| Service and company cars | 8,215.40 | 9,415.53 | 12,306.35 |
| Machinery and equipment | 12,602.36 | 12,887.36 | 15,437.31 |
| Furniture and fixtures | 2,270.14 | 2,270.14 | 2,270.14 |
| Land | 33,206.41 | 33,206.41 | 33,206.41 |
| Prepaid insurance and/or advertising deposits | 4,308.85 | 4,306.65 | |
| Leasehold improvements | 132,014.74 | 125,194.55 | 88,336.03 |
| Total—before reserve for depreciation | 759,029.81 | 763,798.53 | 762,068.71 |
| Less reserve for depreciation on depreciable assets | 21,469.16 | 25,472.15 | 29,700.96 |
| Total assets | 737,560.65 | 738,326.38 | 732,367.75 |
| **Liabilities:** | | | |
| Accounts payable | 47,567.44 | 26,048.79 | 33,410.82 |
| Accrued taxes and insurance | 9,684.53 | 13,581.74 | 14,125.95 |
| Accrued wages | 500.00 | 749.96 | |
| Provision for Federal income taxes | 78,215.97 | 40,768.86 | 16,077.75 |
| Surplus reserves | 32,882.34 | 34,626.74 | 17,445.05 |
| Capital stock | 21,900.00 | 21,900.00 | 21,900.00 |
| Paid-in or capital surplus | 1,825.00 | 1,825.00 | 1,825.00 |
| Earned surplus and undivided profits | 544,985.37 | 598,825.29 | 627,583.18 |
| Total liabilities | 737,560.65 | 738,326.38 | 732,367.75 |

The petitioner's working capital and ratio of current assets to current liabilities as of December 31 of each of the years 1951, 1952, and 1953, inclusive, are as follows:

| December 31 | Working capital | Ratio of current assets to current liabilities |
|---|---|---|
| 1951 | $323,309.57 | 3.3778 |
| 1952 | 293,499.22 | 4.6168 |
| 1953 | 283,234.23 | 5.4524 |

Petitioner's principal business and principal source of income during the taxable years in issue was the sales and servicing of automobiles, trucks, and parts. The Chevrolet Motor Company, of which petitioner owns the Hastings, Nebraska, franchise, required petitioner to maintain a minimum franchise working capital of $206,755, based on planned potential sales of 275 new cars and trucks during the years 1951, 1952, and 1953. Petitioner actually sold 633, 430, and 429 new units in 1951, 1952, and 1953, respectively.

Petitioner participated in extraordinary ventures in its business which required substantial sums of money. In 1948 there was such a venture for the sale of automotive parts to the Chinese Nationalist Government. For this venture petitioner deposited $100,000 and Claren Kerr deposited $50,000 of his own funds in a Denver bank to establish the credit needed for the venture.

The $150,000 deposited was left on deposit until February 1951 because of a possible similar transaction with the Yugoslavian Government. Considerable expense was incurred on this project but it failed to materialize. In April 1951, the petitioner began large scale sales of specially equipped trucks designed for cold weather operations. These sales were made to Peter Kiewit Sons Company, a general contractor engaged in extensive operations and a regular customer of petitioner. The account was carried on petitioner's books under the name of North Atlantic Constructors as an account receivable.

Even though this account was paid promptly as the charges were made, usually within 2 or 3 weeks, in order to carry this large account, which had a debit balance of $473,699.13 on April 25, 1951, petitioner borrowed $40,000 from the Hastings National Bank and on April 26, 1951, $150,000 from the Omaha National Bank. Claren Kerr personally guaranteed these loans. These loans were repaid in May 1951.

During 1951, petitioner borrowed the following additional funds from sources other than Claren Kerr and the banks: $10,000 from Lyle Kerr, $25,000 from Leona Cochran (Thoma), and $40,000 from Kerr-Cochran Sales, Inc. These amounts were repaid in 1951.

A part of petitioner's sales was installment sales which were carried by the petitioner. In 1951 petitioner's total sales, after reduction for returns and allowances, amounted to $2,438,286.97, of which approximately $23,000 were installment sales. In 1952 peti-

tioner's adjusted total sales amounted to $1,526,047.42, of which approximately $64,000 were installment sales. In 1953 petitioner's adjusted total sales amounted to $1,430,568.95, of which approximately $35,000 were installment sales.

During the period from December 28, 1950, to April 17, 1951, Claren Kerr advanced in excess of $119,000 to the petitioner. The entire advance was repaid on or prior to May 23, 1951. During the years 1946 to 1953, inclusive, the petitioner made cash advances to Claren Kerr and he made cash advances to the petitioner. No interest was involved in any of these advances. The advances were carried on petitioner's books as an account receivable entitled "Claren Kerr." The books indicate that over the years 1946 through 1953 petitioner advanced Claren Kerr approximately $287,000, while over the same period Claren Kerr advanced petitioner approximately $300,000.

On June 30, 1949, petitioner purchased a commercial building in Grand Island, Nebraska, at a total cost of $70,000. This building was held by the petitioner as rental property during the years in issue.

Prior to the years in question, Claren Kerr purchased a farm, referred to as Kerr Farm, located near Lexington, Missouri. From 1948 through 1952 petitioner advanced approximately $38,000, without interest, for the operation of the farm. These advances were carried on petitioner's books as an account receivable entitled "Kerr Farm." During the same period $234.35 was repaid. On or about December 31, 1952, Claren Kerr conveyed the Kerr Farm to the petitioner at his approximate book cost of $48,493.13.

Prior to September 22, 1951, petitioner advanced $1,951.35 on the construction of Claren Kerr's personal residence. From September 22, 1951, to July 17, 1952, inclusive, the petitioner advanced the additional sum of $50,081.29, all of which was paid in full as of December 31, 1952, by the conveyance of the Kerr Farm to petitioner, and by debiting Claren Kerr's account in the amount of $3,539.51. These advances were carried on petitioner's books in the Kerr Warehouse account.

The petitioner also advanced money to Gladys Kerr, the wife of Claren Kerr, over the years 1946 through 1953. In December 1951, she repaid the petitioner the sum of $32,304.12, which reduced the balance to zero. In 1952 petitioner advanced Gladys Kerr $27,092.47, which was repaid in full in the same year. In 1953 the sum of $762.52 was advanced and repaid, leaving the balance at zero on December 31, 1953. These advances were without interest and were carried on petitioner's books as an account receivable entitled "Gladys Kerr."

Donald Johnson, Claren Kerr's brother-in-law, operated a truck lot at Fort Lupton, Colorado. He was indebted to petitioner in the

amount of $7,500 and in early 1951 the petitioner loaned him an additional $34,000 for the purpose of acquiring a three-fourths interest in a Chevrolet agency in Auburn, Nebraska. The amount of $6,598.75 was still due on these loans on December 31, 1953.

In January 1951, the petitioner purchased the garage building housing the Chevrolet agency in Auburn, Nebraska, at a cost of $34,500. This building was leased to Donald Johnson at a monthly rental of $250 during the years in issue.

Claren Kerr and Ralph J. McKenzie entered into a joint venture for the construction and sale of houses. Petitioner advanced money in 1951 and 1952 to finance the venture. When this account was transferred from the Kerr Warehouse account to an account entitled "Ralph J. McKenzie, Contractor," on September 22, 1951, there was a balance of $28,009.27 which had been advanced by petitioner. On November 17, 1952, the balance of $51,214.22 in this account was transferred to a note receivable account entitled "McKenzie Chevrolet Company."

On January 21, 1952, petitioner loaned Ralph J. McKenzie, doing business as McKenzie Chevrolet Company, the sum of $41,700 to acquire a Chevrolet agency in Arizona. After repayment of the money advanced for the housing venture and the $41,700, the petitioner was to share in the profits of the McKenzie Chevrolet Company to the extent of 25 per cent of the net income after taxes.

On January 19, 1952, petitioner loaned the Bonahoom Seed Company the sum of $10,000. The money was loaned because Bonahoom was a good friend of Claren Kerr and needed the money and was carried as an account receivable. No interest was charged for the money and it was fully repaid in 1953.

During December 1952 the petitioner and others formed an irrigation farm partnership in Arizona known as Centennial Farms. As of December 31, 1952, petitioner's investment in this farm was $2,328.80. On December 31, 1953, before reductions for 1953 operating loss, the petitioner's investment was $111,913.69. This operation was carried on petitioner's books as an account receivable.

During 1953 petitioner participated in the drilling of three productive oil wells as a one-eighth owner. On December 31, 1953, petitioner's investment was $2,540.27 and was carried on petitioner's books as an account receivable. Petitioner's total investment in stock interests and oil leases as of December 31 of each of the years 1951 through 1953 was as follows:

| December 31 | Total investments oil leases and stock interests |
| --- | --- |
| 1951 | $36,248.21 |
| 1952 | 38,108.21 |
| 1953 | 34,797.38 |

Claren Kerr and Leona Cochran Thoma are equal partners in the Chevrolet agency in Creston, Iowa. The partners were advised to build a garage or forfeit the franchise. During 1953, petitioner advanced $46,750 for the construction of the garage, of which $15,750 was repaid in 1953, leaving a balance of $31,000 on December 31, 1953, which was carried as an account receivable. At the time of the garage construction, petitioner was attempting to purchase Leona Cochran Thoma's interest in the Creston agency but the purchase has never been completed.

The following schedule reflects the salary, bonus, and total compensation paid to Claren Kerr by the petitioner in each of the years in issue:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1951 | $3,600 | $28,580.00 | $32,180.00 |
| 1952 | 3,600 | 22,255.82 | 25,855.82 |
| 1953 | 3,600 | 15,050.00 | 18,650.00 |

The bonuses were based on a 15 per cent computation of the net profits.

The property on which petitioner's main building is located, which includes the main office, showroom, and service department, is rented by the petitioner. This property has been rented by petitioner since its incorporation. Petitioner has made attempts to purchase the property but the owner has told petitioner repeatedly that he is not interested in selling the property.

As of December 31 of each of the years 1949 to 1953, inclusive, petitioner's funds were being used in the following amounts for purposes other than the automotive business:

| Use of funds for purposes other than automotive business | Year ended December 31— | | | | |
|---|---|---|---|---|---|
| | 1949 | 1950 | 1951 | 1952 | 1953 |
| Advances to Claren Kerr | $676.31 | ($3,331.45) | | $3,539.51 | ($13,464.60) |
| Advances to Gladys Kerr | 17,304.12 | | | | |
| Advances for operation and purchase of Kerr Farm | 5,596.21 | 15,072.97 | $38,006.97 | 86,500.10 | [1] 99,711.60 |
| Purchase and operation of Centennial Farms | | | | 2,328.80 | [1] 111,913.69 |
| Construction of personal residence for Claren Kerr | | | 29,897.61 | | |
| Loan to Donald Johnson including prior debt of $7,500 | 7,500.00 | 7,500.00 | 37,429.75 | 21,429.75 | 6,598.75 |
| McKenzie house venture | | | 26,304.16 | 51,214.22 | 20,144.03 |
| Securities and oil and gas leases | 34,157.26 | 38,538.21 | 36,248.21 | 38,108.21 | 34,797.38 |
| Grand Island real estate | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 |
| Auburn real estate | | | 34,500.00 | 34,500.00 | 34,500.00 |
| Construction of Kerr Warehouse | | 59,193.99 | 146,404.23 | 177,617.83 | 177,617.83 |
| Loan to R. J. McKenzie | | | | 37,700.00 | 33,700.00 |
| Loan to Bonahoom Seed Co | | | | 5,000.00 | |
| Construction of garage building, Creston, Iowa | | | | | 31,000.00 |
| Purchase of working interest in gas wells | | | | | 2,540.27 |
| Total | 135,233.90 | 186,973.72 | 418,790.93 | 527,938.42 | 609,058.95 |

[1] Before deduction of 1953 operating loss.

Petitioner was advised in May 1952 of possible liability for 1949 and 1950 under section 102, I. R. C. 1939. In July of 1952 petitioner was notified that the claimed deficiency was approximately $62,000. Petitioner's liability under such section for 1949 and 1950 was determined in an opinion filed April 15, 1955.

If the petitioner had distributed as a dividend its entire net income, after payment of Federal income taxes, for each of the years 1951, 1952, and 1953, Claren Kerr's income tax liability in those years would have increased by the respective approximate amounts of $58,000, $31,000, and $15,000. These computations were approximated from figures taken from the tax returns of petitioner and Claren Kerr as filed, before any adjustments were made.

Petitioner was availed of during the taxable years for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed.

### OPINION.

The first issue is whether the cost of the warehouse constructed by the petitioner in 1951 is to be depreciated, as petitioner contends, over the period of a 5-year lease, or whether, as respondent contends, such cost should be depreciated over the life of the warehouse. The total cost of the warehouse was $177,617.83 and it was completed in June 1951. On December 1, 1950, the petitioner obtained a lease of the ground on which the warehouse was built from the Burlington Railroad for a period of 5 years. The annual rental was $56 and it was provided in the lease that any holding over by the lessee would create a tenancy at will, terminable without notice.

Petitioner contends it had the right to amortize the cost of the warehouse over the 5-year period of the lease. Petitioner's argument necessarily implies the contemplated abandonment of the warehouse at the expiration of the 5-year lease. And yet petitioner's own evidence is that the warehouse it built would have a useful life far beyond the expiration date of the lease and that the usefulness of the warehouse as income-producing property would not end with the lease. This case is quite different from the cases cited by petitioner where it was held the value of improvements erected upon leased property could be amortized over the life of the lease. Here the title to the improvement was not to pass to the lessor at the expiration of the lease term, as was the case in *Weber-Bunke-Lange Coal Co.*, 11 B. T. A. 503, or *1620 Broadway Corporation*, 36 B. T. A. 149. On the contrary, the lease gave petitioner the right to remove the improvement upon the termination of the lease. But the most sig-

nificant fact, not present in any case cited by petitioner, is the policy of renewal by the lessor railroad so long as the venture is productive of railroad business.

The testimony of the railroad agent was that in normal procedure the tenancy at will, that followed the 5-year lease, would remain uncanceled so long as the building produced traffic for the railroad. The record here is that the tenancy at will was still continuing at the time of trial in September 1956, and it was Claren Kerr's testimony that petitioner had not paid the ground rent since the expiration of the 5-year lease.

Even though the original lease was for 5 years, we think it was reasonably certain, from all of the evidence, that petitioner's tenancy was to continue for an indefinite period of time. As was stated in *Standard Tube Co.*, 6 T. C. 950, 955, "where the tenancy of the lessee is for an indefinite period the allowance for exhaustion of the cost of improvements should be based upon the life of the improvements."

Respondent's determination of deficiency is based upon the life of the building as 66⅔ years. On brief respondent concedes this figure is excessive and now contends that the life of the warehouse is 40 years. In our Findings of Fact we have pointed out that the building was cheaply constructed and not well designed. We are impressed with the testimony of the architect who testified for petitioner, who had made a thorough examination of the building. We accept his opinion that the life of the building would be 20 years, and so hold.

The next issue is whether respondent was correct in determining that petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the taxable years 1951, 1952, and 1953, and that it is therefore subject to tax under section 102 of the Internal Revenue Code of 1939. Respondent contends that the earnings and profits of the petitioner were permitted to accumulate beyond the reasonable needs of the business during these 3 years. Prior to the notice of deficiency, the respondent mailed a notification, as provided for in section 534 (b) of the 1954 Internal Revenue Code,[1]

---

[1] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e) (2) applies and which is mailed on or before the

to the petitioner, and, in accordance with the provisions of section 534 (c) (see footnote 1) of the 1954 Code, the petitioner submitted a timely statement to the respondent containing the grounds upon which it relied to establish that all or any part of its earnings and profits had not been permitted to accumulate beyond the reasonable needs of the business. Under section 534 (a) (see footnote 1) of the 1954 Code, it is specified that the burden of proof on the allegation that all or any part of the earnings and profits of the petitioner had been permitted to accumulate beyond the reasonable needs of the business is on the respondent with respect to the grounds set forth in the petitioner's statement under section 534 (c).

Petitioner, in its statement to the respondent, listed nine grounds upon which it relies to establish that its earnings and profits were not permitted to accumulate beyond the reasonable needs of its business. Respondent points out that no facts are given to support the third ground listed by the petitioner, and that as to the other eight grounds, the facts are not in sufficient detail to permit proper evaluation and that, consequently, the burden of proof on the allegation of unreasonableness does not shift to the respondent. As to the third ground, which is without supporting facts, the respondent is clearly correct. However, as to the sufficiency of the supporting facts of the remaining eight grounds given by the petitioner, it is unnecessary for us to decide, since, assuming that the burden of proof has been shifted to the respondent, he has successfully met this burden.

No dividends were paid by the petitioner to its stockholders from the date of its incorporation down through the year 1953. Petitioner's earned surplus was $544,985.37 at the end of 1951, $598,825.29 at the end of 1952, and $627,583.18 at the end of 1953. Petitioner's net income after taxes for these 3 years was $87,924.84, $50,049.90, and $28,757.89, respectively. During these years the petitioner, in addition to its principal activity of buying, selling, renting, and repairing automotive vehicles, parts, and equipment, engaged in activities not directly related to its automotive business.

In 1951 petitioner expended approximately $87,000 on a warehouse which had been begun in 1950 and in 1952 a sprinkler system and a firewall were added at a cost of $31,213.60. The petitioner's purpose for constructing the warehouse was, in part, to create a rent-producing

---

30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day.

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

property, and it appears from the evidence that the petitioner obtained substantial rent from this property during the years before us. From 1948 through 1952 the petitioner advanced approximately $38,000, without interest, for the operation of a farm purchased by Claren Kerr, individually. During this same period only $234.35 was repaid to the petitioner. From September 22, 1951, to July 17, 1952, inclusive, the petitioner advanced the sum of $50,081.29 (in addition to $1,951.35 advanced at a prior date) for the construction of Claren Kerr's personal residence. These advances for the personal residence were paid in full as of December 31, 1952, by the conveyance of Kerr's farm to the petitioner and by debiting Kerr's account in the amount of $3,539.51. In 1952 the petitioner advanced $27,092.47 to Gladys Kerr, the wife of petitioner's controlling stockholder, which was repaid in full in the same year. In 1953 the amount of $762.52 was advanced to her by the petitioner, and this, too, was repaid in the same year. These advances were without interest. In 1951 the petitioner loaned $34,000 to Claren Kerr's brother-in-law to enable him to acquire a three-fourths interest in a Chevrolet agency in Auburn, Nebraska. The amount of $6,598.75 was still due on this loan on December 31, 1953. Petitioner advanced money in 1951 and 1952 to finance a joint venture of Claren Kerr and Ralph J. McKenzie in the construction and sale of houses. This account, entitled "Ralph J. McKenzie, Contractor," showed a balance of advances in the amount of $28,009.27 on September 22, 1951, and on November 17, 1952, there was a balance showing advances in the amount of $51,214.22. On January 21, 1952, the petitioner loaned Ralph J. McKenzie, doing business as the McKenzie Chevrolet Company, the sum of $41,700 to acquire a Chevrolet agency in Arizona. In 1952 the petitioner made a loan of $10,000, without interest, to the Bonahoom Seed Company. The loan was made because Bonahoom was a good friend of Claren Kerr. In December 1952 the petitioner and others formed an irrigation farm partnership in Arizona known as Centennial Farms. On December 31, 1952, petitioner's investment in this farm was $2,328.80, and on December 31, 1953, before reduction for the 1953 operating loss, petitioner's investment was $111,913.69. During 1953 the petitioner participated in the drilling of three productive oil wells as a one-eighth owner. Petitioner's total investment in stock interests and oil leases at the end of 1951, 1952, and 1953 was $36,248.21, $38,108.21, and $34,797.38, respectively. During 1953 the petitioner advanced $46,750 for the construction of a garage for a Chevrolet agency in Creston, Iowa, in which Claren Kerr and Leona Cochran Thoma were equal partners. A balance of $31,000 remained outstanding on this loan as of December 31, 1953.

Petitioner's use of its funds during the years 1951, 1952, and 1953 for the various investments outlined above, and for the purpose of making loans of a personal nature, shows, in our opinion, that its earnings and profits to this extent were not needed in the operation of its automotive business, and that such amounts were therefore accumulated beyond its reasonable needs within the meaning of section 102 (c) of the 1939 Code. *Helvering* v. *National Grocery Co.*, 304 U. S. 282; *Kerr-Cochran* v. *Commissioner*, 253 F. 2d 121 (C. A. 8, 1958), affirming T. C. Memo. 1955–90.

There is no merit to the argument that these various ventures were somehow a part of petitioner's business. We have found as a fact that it was in the automotive business and that the other ventures engaged in by the petitioner were either of an investment nature or were undertaken by a desire to earn profits in a venture unrelated to its business.

There was no need on petitioner's part, during the years before us, to accumulate its earnings and profits for the purpose of expansion. The evidence is clear that the property where petitioner was operated was rented by it since its incorporation and there was no indication by the owner of any willingness to sell the property to the petitioner. It follows, then, that no funds would have to be accumulated for that purpose. Moreover, any argument made by the petitioner along this line is incompatible with the use of the corporate funds in the various ways outlined above, which were unrelated to its business. Also, from the evidence presented, we are convinced that the petitioner contemplated no expansion in its business during the years 1951 through 1953.

We are also persuaded that there was no need to accumulate the earnings and profits of the petitioner, to the extent that they were so accumulated, for the purpose of strengthening its financial position. An examination of the financial statements of the petitioner for the years here pertinent reveals that its working capital was favorable and this was true despite the outside use made by the petitioner of portions of its funds. Furthermore, the ratio of petitioner's current assets to current liabilities on December 31, 1951, 1952, and 1953, was 3.3778, 4.6168, and 5.4524, respectively, which indicates strongly that the financial position of petitioner during these years was very favorable.

We have examined the petitioner's contention that it required substantial sums to finance its business of leasing truck units to large fleet operators. The evidence shows that this activity was a small portion of petitioner's sales and we are convinced that this particular activity did not require the petitioner to accumulate its earnings

and profits to the extent that it did so during the years 1951 through 1953. Nor can we accept the petitioner's argument that it was necessary to retain its earnings to pay income tax deficiencies which might be determined in the future. This concern for possible tax liability is certainly incompatible with petitioner's use of funds in the years 1951 through 1953 in the various ventures and for the personal purposes outlined above. Moreover, the question of tax liability, even for the years 1949 and 1950, was tried before this Court in 1954, and our opinion filed in 1955. We cannot accept petitioner's argument that its concern for tax liability prompted the accumulation of its earnings and profits during these years.

A careful examination of the entire record convinces us that petitioner's earnings and profits were permitted to accumulate during the years 1951, 1952, and 1953 beyond the reasonable needs of petitioner's business within the meaning of section 102 (c).

Under section 102 (c) a finding that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is deemed determinative of the purpose to avoid surtax upon shareholders, within the meaning of section 102 (a), unless the petitioner proves to the contrary by a clear preponderance of the evidence. *Pelton Steel Casting Co.*, 28 T. C. 153, affd. 251 F. 2d 278 (C. A. 7, 1958). We hold that the petitioner has not met its burden of proof in this respect.

During the years before us Claren Kerr owned 213 shares out of the 219 shares outstanding of the petitioner's stock and it is quite apparent from all the evidence that he had ready access to the petitioner's funds for his personal needs and that he repeatedly, over the years 1951, 1952, and 1953, availed himself of the petitioner's funds, either to embark upon ventures completely unrelated to the petitioner's business or to make loans which were manifestly personal in nature and wholly unrelated to the petitioner. No dividends were distributed by petitioner during the years before us and this failure to pay dividends resulted in pronounced tax savings for Claren Kerr. If the petitioner had distributed as a dividend its entire net income, after payment of Federal income taxes, for each of the years 1951, 1952, and 1953, Claren Kerr's income tax liability in those years would have increased by the respective approximate amounts of $58,000, $31,000, and $15,000. Obviously, by permitting the earnings and profits of the petitioner to remain intact, Kerr was able to carry on his personal ventures with petitioner's funds, unreduced by personal income taxes. With the petitioner's funds so readily accessible for Kerr's personal needs, it was immaterial to Kerr, economically speaking, that the petitioner did not declare dividends. We hold,

under the facts of this case, that the petitioner was availed of during the years 1951, 1952, and 1953 for the purpose of preventing the imposition of surtax upon its shareholders. *Helvering* v. *National Grocery Co., supra; Kerr-Cochran* v. *Commissioner, supra.*

*Decision will be entered under Rule 50.*