Norvell-Wilder Supply Company v. Commissioner.
Norvell-Wilder Supply Co. v. Commissioner
Docket No. 72722.
United States Tax Court
T.C. Memo 1960-262; 1960 Tax Ct. Memo LEXIS 26; 19 T.C.M. (CCH) 1472; T.C.M. (RIA) 60262; December 8, 1960
*26 Held, that the cost of the improvements made by petitioner on leased property in the instant case is to be depreciated over the useful life of said improvements and may not be amortized on the basis of the remaining stated period of the lease. Peter B. Wells, Esq., American National Bank Building, Beaumont, Tex., for the petitioner. Harold Friedman, Esq., for respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This proceeding involves a deficiency in income tax determined against petitioner for the taxable year 1955 in the amount of $7,567.34. The only issue requiring our consideration is whether petitioner may amortize the cost of improvements made by it on leased property on the basis of the remaining stated period of the lease or whether said cost is to be depreciated over *27 the useful life of the improvements. Findings of Fact Petitioner, Norvell-Wilder Supply Company, is a corporation organized under the laws of the State of Texas, with its office and principal place of business in Beaumont, Texas. Petitioner was incorporated on June 22, 1910, and is engaged in the business of selling oil well and other industrial supplies principally in Texas, Oklahoma and Louisiana. Petitioner has ten branch warehouses and five sales offices in major cities throughout its territory. Petitioner's U.S. Corporation Tax Return, Form 1120, for the year 1955 was filed with the district director of internal revenue, Austin, Texas. In its income tax return for 1955, petitioner claimed depreciation on a building and switch track in Fort Worth, Texas, in the amount of $15,007.04 for the building and $303.54 for the switch track. The cost of the building was shown as $97,545.96 and rate of depreciation was shown as 52 months. The cost of the switch track was shown as $2,529.55 and the rate of depreciation was shown as 50 months. Norvell-Wilder has maintained a branch warehouse in Fort Worth, Texas, for a number of years. Elvis V. Hubbard has been branch manager at *28 Fort Worth for the past 14 years. The nearest Norvell-Wilder warehouse to the one in Fort Worth is the branch warehouse in Shreveport, Louisiana, which is over two hundred miles away. During 1954, the Fort Worth branch, which was then located at 1111 Lamar Street, Fort Worth, Texas, was forced to move because it was located in the path of a new highway. A lease agreement was negotiated by F. S. Carothers, the president of the company, under which Norvell-Wilder leased a warehouse site from the St. Louis Southwestern Railway Company consisting of 91,960 feet of unimproved industrial land. Petitioner, as lessee, executed a written leasing agreement on August 30, 1954, denominated as "Standard Industrial Ground Lease Agreement," with the St. Louis Southwestern Railway Company, which lease provided in pertinent part as follows: 1. LESSOR, in consideration of the due performance of each of Lessee's covenants herein, hereby leases to Lessee a part of the right of way owned, leased, operated or controlled by Lessor at North Fort Worth, County of Tarrant, State of Texas, 91,960 square feet in area, described as Industrial Lot No. "C" 633.012-L, as shown on print of same hereto attached, *29 identified as Exhibit "A", and hereby made a part hereof, to be used solely for the purpose of erecting and maintaining a warehouse for storing and handling oil well, refinery and industrial supplies and for maintaining a storage yard for storing and handling pipe in carload lots. 2. LESSEE, in consideration thereof, hereby agrees to: (a) Pay Lessor at the rate of $1,102.00 per annum, payable annually in advance; (b) pay all taxes levied against buildings, structures, and facilities owned or placed on said leased property by Lessee; (c) maintain said premises in a clean, safe and presentable condition; (d) permit no thing on said premises nearer any track owned, leased, operated or controlled by Lessor than prescribed by its then current standard clearances; (e) prevent any encroachment by other persons, their animals or things upon said premises; and (f) within thirty (30) days after the termination hereof raze or remove all buildings, structures and things from said premises and return said premises to Lessor free and clear of all debris. * * *
5. Subject to the provisions of this Section 5, this agreement shall bind and inure to the successors and assigns of the parties *30 hereto, provided that Lessee shall not assign, voluntarily or involuntarily, any right granted to Lessee hereunder, and shall not sublease said premises without Lessor's written consent; and this agreement shall continue for a term of five years from the date hereof and thereafter until terminated by thirty (30) days' notice by registered mail, by one of the parties to the other, sent to the other party's last known address; provided, however, that this agreement may be terminated by Lessor at any time upon Lessee's abandonment of the premises for the purposes leased. On August 30, 1954, petitioner executed a "Standard Industrial Track Agreement" with the St. Louis Southwestern Railway Company, which agreement provided in pertinent part as follows: 1. RAILWAY acknowledges receipt of Two Thousand Five Hundred Twenty-Nine and 55/100 Dollars ($2,529.55) deposited by Industry, and in consideration of the due performance of each of Industry's covenants herein, covenants that it will: (a) construct, serve Industry on and maintain Industrial Track No. "C" 633,042-L, at N. Ft. Worth, County of Tarrant, State of Texas * * *. * * *
4. Subject to the provisions of this Section 4, this *31 agreement shall bind and inure to the successors and assigns of the parties hereto, provided, Industry shall not assign, voluntarily or involuntarily, any right granted to it hereunder without Railway's written consent; and this agreement shall continue in effect for one (1) year from the date hereof and thereafter until terminated by thirty (30) days' notice by registered mail, by one of the parties to the other, sent to the other party's last known address; provided, however, that this agreement may be terminated by Railway at any time upon Industry's abandonment of the use of said track. * * *
On or about April 30, 1955, petitioner completed construction of a new branch warehouse on the site leased from the St. Louis Southwestern Railway Company. The original cost of constructing the warehouse building was $97,545.96. The building was a truck-level height warehouse comprising about 23,000 square feet. It had a concrete slab foundation, walls of tilt-up slabs, a roof of corrugated sheet iron steel, galvanized, some plastic material, and was supported by steel I-beams of substantial size. The warehouse building that was placed on the site leased from the Railway Company *32 was a permanent type, well-constructed warehouse building, which had a useful life of 28 years. In 1955, petitioner received only four or five carloads of equipment by the railroad and did not make any rail shipments. Opinion Petitioner contends that it is entitled to amortize the cost of the warehouse over the remaining stated period of the lease, a period of a little less than five years. Respondent contends that the warehouse cost is to be depreciated over its useful life, a period stipulated to be 28 years. Both parties appear to agree that the same basic treatment is to be accorded to the branch track as is accorded to the warehouse. The fundamental test to be applied in resolving the issue is whether or not there was, in 1955, a reasonable certainty that occupancy of the leased premises and improvements by petitioner would be extended for an indefinite period beyond the stated period of the lease. Standard Tube Co., 6 T.C. 950 (1946); Kerr-Cochran Inc., 30 T.C. 69 (1958); Highland Hills Swimming Club, Inc., v. Wiseman, 272 F. 2d 176 (C.A. 10, 1959). If there was such a reasonable certainty, we must hold for respondent. If there *33 was not, petitioner's claimed amortization must be approved. The respondent's determination is prima facie correct and the burden of proof of error rests with petitioner. This includes, where material, the negation of an otherwise essential element of the case. Needless to say, the lease itself is a factor to be considered, but is not of itself controlling or binding upon the respondent. The evidence offered is on the whole of little significance. To the extent that it is meaningful, it would tend to support respondent's determination rather than demonstrate error therein. It is reasonable to infer that at the time the lease was executed (August 30, 1954), petitioner intended to erect a warehouse on the premises. It actually completed the warehouse on April 30, 1955. Without such intent, the lease would have been purposeless. The warehouse was a permanent type structure with a stipulated useful life of 28 years. Its cost was $97,545.96. It would appear unlikely that petitioner would have erected a warehouse of a permanent type with a probable useful life of 28 years and at a cost of $97,545.96 without at least examining into the question of whether it could be assured of the *34 opportunity of using it over a period extending considerably more than the stated five-year period in the lease. The lease was negotiated with the lessor by f. s. c/arothers, then president of petitioner. It would appear likely that he would have known what assurances of an extension (if any) had been received from the lessor, or that no such assurances had been given. Carothers, however, was not produced as a witness. Assuming that there was good reason for his failure to appear and testify, we, nevertheless, cannot go further and assume what evidence he might have been able to supply. It is clear upon the record that Hubbard, petitioner's branch manager, had no part in any lease negotiations and did not know one way or the other about any assurances of an extension. He referred, however, to a "Mr. Sprague of the Cotton Belt" (in addition to Carothers) as having something to do with negotiating the lease. Sprague, likewise, did not testify and again we cannot assume what evidence he might have supplied. No others were named as having a part in the negotiations. It would seem probable that some official or officials of lessor or lessee, or both, were available at the time of *35 trial, and in a position to enlighten the Court as to what assurances, if any, were given in relation to a period of occupancy extending beyond the stated term of the lease. None were produced by petitioner, which bore the burden of proof, and there was no explanation or suggestion to the effect that either there were no such assurances, or that for some acceptable reason material witnesses were not available at the time of trial. In the light of the foregoing, our only course is to hold that petitioner has failed to meet the burden of proof of error in respondent's determination. We are aware of the fact that in a somewhat similar situation (McWilliams v. United States, - F. Supp. - (D.C.Ill., 1958), a District Court appears to have reached a contrary result. We do not have, however, the benefit of the details of the record in that case. In any event, assuming arguendo, that McWilliams cannot be distinguished on the facts from the instant case, we cannot agree with the conclusion reached therein and must adhere to our own views as expressed above. Decision will be entered under Rule 50.