THE MERCHANTS NATIONAL BANK OF TOPEKA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Merchants Nat'l Bank v. Commissioner
Docket No. 382-73.
United States Tax Court
T.C. Memo 1975-238; 1975 Tax Ct. Memo LEXIS 136; 34 T.C.M. (CCH) 1030; T.C.M. (RIA) 750238; July 17, 1975, Filed Murray F. Hardesty and Bryon R. Schlosser, for the petitioner. Joe K. Gordon, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following deficiencies in petitioner's Federal income taxes: TYE
Deficiency
12/31/69
$23,301.14
12/31/70
38,861.98
Petitioner claims that it is entitled to refunds in the amounts of $10,107.56 and $3,360.45, respectively, of its 1969 and 1970 taxes. Because of concessions by both parties, the only matters remaining for our decision are the useful lives, for depreciation purposes, of certain components of an office building which petitioner constructed in 1969 and 1970. FINDINGS OF FACT Some of *137 the facts have been stipulated and are so found. At the time of the filing of the petition herein, The Merchants National Bank of Topeka (petitioner) had its principal place of business in Topeka, Kansas. It filed its 1969 and 1970 corporate income tax returns with the Director, Internal Revenue Service Center, Austin, Texas. On July 1, 1969, petitioner completed the construction of a 16-story office building in the downtown business area of Topeka, Kansas, at a cost of $5,545,079. Certain additions to the building were completed in the following year at a cost of $133,943.21. The parties agree that the above-described total cost figures are allocable to the various component parts of the building as follows: 1970
1969
Additions
Cost
Cost
1. Structure
3,107,928.21
2. Addition-1970
60,705.89
3. Precast Concrete
750,574.88
4. Sprinkler
13,211.22
5. Plumbing - pIping
14,355.12
6. Plumbing-Fixtures
53,831.71
7. Plumbing-Equipment
16,183.21
8. Plumbing-Title
52,840.11
9. Plumbing-Addition
2,763.95
10. Electrical
46,361.68
11. Electrical-Addition
6,296.75
12. Electrical-Lamps&Fixtures
133,892.23
13. Electrical-Tranf. & Panels
95,660.55
14. Ceilings
18,743.29
15. Addition
4,025.00
16. Partitions & Doors
145,144.23
17. Addition
49,173.43
18. Roof
89,728.50
19. Elevators
294,440.14
20. Switches & Gears
* 44,678.12
21. Htg.&Air Conditioning
165,011.42
22. Sheet Metal
208,190.21
23. Temperature Controls
57,267.44
24. Hot & Chill Tower
39,326.55
25. Painting & Decorating
72,746.62
26. Addition
7,271.09
27. After Hour Depository
3,430.14
28. Vault Doors
41,907.87
29. Asphalt Paving
5,184.31
30. Resilient Floors
10,368.63
31. Vacuum System
9,922.52
32. IBM Piping
1,742.03
33. Generator
10,069.53
34. Sign
13,681.00
35. Window-Washing Scaf
26,400.00
36. Decorating
2,257.53
37. Furniture&Fixtures
3,707.10
5,545,079.00
133,943.21
*138 The building has a frame of structural steel with masonry and precast panel walls. Of its 16 stories, floors two through five provide customer and tenant parking for the bank and office areas, but the record does not establish how many of the other floors are bank occupied, and how many are occupied by tenants leasing office space from petitioner. The building is fireproofed throughout by a sprinkler system designed to last for the life of the structure. Air-conditioning and heating are central, with zoned humidity and temperature control. The air-conditioning units, together with temperature controls, will probably have to be replaced in approximately 20 years due to physical deterioration. The heat and chill towers deteriorate more rapidly, and replacement in 15 years will likely be dictated. The ducts of the current air-conditioning system will only have to be replaced if a new type of system is introduced, and the likelihood of such occurring before the actual structure of the building has been replaced has not been established *139 in the record. Space on the office floors is segregated by dry-wall partitions, which, in some areas of the building, are movable. The location of such partitions is normally a function of the changing demands of the various tenants. They will normally have to be replaced within about 20 years, together with doors and ceilings, because of the deterioration in their appearance, and a replacement of the ceiling will also normally call for replacement of appurtenant lighting fixtures. Such a major remodeling may demand replacement of the building's switches and gears system. The ceilings on each floor are acoustical, and the building is carpeted throughout the office areas. Windows are fixed and double paned, set in neoprene, and a service core in the building houses all elevators, stairwells, washrooms (which are ceramically tiled), and service ducts. The building's plumbing fixtures, which are of a standard type, will demand replacement in approximately 20 years due to their physical deterioration. As noted above, the building is located in the downtown central business district of Topeka, Kansas. That area contains professional offices, retail stores, financial institutions, *140 communication and transportation facilities, government buildings, hotels, and similar facilities, and is considered the "hub" of activity in Metropolitan Topeka. The building was constructed on a 29,000 square-foot plot of land, but each floor in the office tower takes up only 8000 square feet of space. On its 1969 corporate income tax return petitioner claimed a half year's depreciation for that portion of the building completed on July 1, 1969. On its 1970 return petitioner claimed a full year's depreciation on that portion of the building completed on July 1, 1969, and a half year's depreciation for the 1970 additions. In computing its depreciation deductions for each of these years, petitioner utilized the component method of depreciation. Each asset account of the building was assigned a separate useful life, and depreciation was calculated thereon. Each asset account was depreciated on the basis of the double declining balance method of depreciation. In his statutory notice of deficiency, respondent determined that certain of the asset accounts had been assigned improper useful lives by petitioner. The following table presents the useful lives utilized by petitioner in its *141 return, together with respondent's determinations in the statutory notice: Petitioner
Respondent
Structure (including pre-cast concrete)
50
65
1970 Additions
50
65
Sprinkler
30
65
Plumbing-Piping
30
Allowed
Plumbing-Fixtures
10
30
Plumbing-Equipment
10
30
Plumbing-Tile
30
Allowed
1970 Additions
30
Allowed
Electrical
25
Allowed
1970 Additions
25
Allowed
Electrical-Lamps & Fixtures
15
25
Electrical-Transformers & Panels
20
25
Ceilings
25
Allowed
1970 Additions
25
Allowed
Partitions & Doors
20
25
1970 Additions
20
25
Roof
25
Allowed
Elevators
20
25
Switches & Gears
20
25
Heating & Air-Conditioning
20
Allowed
Sheet Metal (Ducts)
25
65
Temperature Controls
10
20
Hot & Chill Tower
10
20
Painting & Decorating
8
Allowed
1970 Additions
8
Allowed
After-Hour Depository
30
Allowed
Vault Doors
30
Allowed
Asphalt Paving
25
Allowed
Resilient Floors
20
Allowed
Vacuum System
10
Allowed
IBM Piping
10
Allowed
Generator
10
Allowed
Sign
10
Allowed
Window Washing Scaffold
10
Allowed
Decorations
8
Allowed
Furniture & Fixtures (1970)
10
Allowed
OPINION We are called upon in *142 the instant case to decide, for depreciation purposes, the useful lives of various components of an office building constructed by petitioner in Topeka, Kansas, in 1969. Certain additions to such building were completed in the following year, and the useful lives of numerous components of such additions are also in dispute.[1] The issue of an asset's useful life is inherently one of fact, and it is petitioner's burden to demonstrate that the useful lives determined by respondent are erroneous. Dielectric Materials Co.,57 T.C. 587, 592 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure.An asset's "useful life" is to be distinguished from its potential "physical life." As stated by the Supreme Court, it has long been held that the useful life of an asset is "the number of years the asset is expected to function profitably in use." Massey Motors v. United States,364 U.S. 92, 96 (1960). In M. Pauline Casey,38 T.C. 357 (1962), we expressed our understanding of the above test: This test logically assumes that when an asset can no longer be profitably used by the owner, it will be disposed of. While the physical life of *143 the asset is certainly important in ascertaining economic life, it cannot be used as the sole criterion in determining useful life for depreciation purposes if it is shown that the asset will have a shorter economic life than physical life. *144 In his regulations, respondent has listed those other factors, in addition to physical life, commonly taken into account in fixing an asset's useful life for purposes of depreciation: Sec. 1.167(a)-1(b) Useful life. * * * (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * In making outrfindings as to useful life in the instant case, we have relied heavily on the testimony of the expert witnesses produced by both parties during the trial. Petitioner's experts, who included the general contractor of the building and an engineer, impressed us with their obvious qualifications and experience. These two witnesses, especially, demonstrated an intimate familiarity with the building, and their testimony as to the maintenance and deterioration aspects of many of the building's components was thus entitled to, and given careful consideration. See Kerr-Cochran, Inc.,30 T.C. 69, 79 (1958); Laura Massaglia,33 T.C. 379, 388 (1959), *145 affd. 286 F. 2d 258 (10th Cir. 1961). Also helpful were their opinions as to the future changes and remodelings of the building which would be required of the petitioner-lessor in order that the building might continue to attract tenants and be operated profitably. Respondent's expert witness, while not as experienced and as familiar with the structure as petitioner's witnesses, made a study of office buildings in downtown Kansas City, Missouri. Of 15 such buildings in that City, ranging in height from 8 stories to 20 stories, respondent's expert found that 5 of the structures had been in existence for over 65 years, 9 for over 60 years, and 10 for over 50 years. Unfortunately, the expert testified in only the most general manner concerning any changes and remodelings which these buildings had undergone. Only as to four of the structures which had been in existence for over 65 years did he testify with any specificity as to remodelings. Of such four buildings, three had undergone major remodelings approximately 60 years after initial construction and one had undergone such remodeling after only 41 years. However, the expert did not indicate--except as to one of the *146 buildings, the exterior of which was remodeled 61 years after initial construction--whether these major remodelings included work on the actual structures of the buildings, information which would certainly have been quite helpful to us in making our findings herein. This Court professes no special expertise in the areas in which we are called upon to render a decision in the instant case. As we noted at trial, agreement between the parties would have been a far more satisfactory method for settling the issues now before us, issues which are simply not susceptible to any precise formula treatment. On the basis of all the facts in the record before us, including the testimony of the expert witnesses called by both parties, we hold that the useful lives of those components of petitioner's building as to which the parties were unable to reach agreement are as follows: Component
Useful Life
Structure (including pre-cast cement)
55
1970 Additions
55
Sprinkler
55
Plumbing-Fixtures
20
Plumbing-Equipment
20
Electrical-Lamps & Fixtures
20
Electrical-Transformers & Panels
25
Partitions & Doors
20
1970 Additions
20
Elevators
25
Switches & Gears
20
Sheet Metal (Ducts)
55
Temperature Controls
20
Hot and Chill Tower
15
*147 Decision will be entered under Rule 155.
Footnotes
*. The cost allocable to "Switches & Gears" has been increased by a $4,400 item improperly included by petitioner as a part of a plumbing account.↩
1. Respondent does not dispute that petitioner was entitled to utilize the component method of depreciation. See Herbert Shainberg,33 T.C. 241, 254 (1959), acq. 1960-1 C.B 5; sec. 1.167(a)-7(a), Income Tax Regs.; Rev. Rul. 68-4, 1968-1 C.B. 77. That petitioner would have been entitled to a greater or lesser annual depreciation deduction in the year before us had it decided to avail itself of the composite method of depreciation and had it chosen one useful life for its entire building from the guideline useful lives presented in Rev. Proc. 62-21, 1962-2 C.B. 418, is not significant in the instant case because we are convinced that the record before us establishes the proper useful lives for purposes of the component method and that a "reasonable allowance for exhaustion, wear and tear" (sec. 167(a)) is calculable therefrom. Any such difference in the annual amounts of depreciation to which petitioner would have been entitled only suggests to us that respondent's guidelines in Rev. Proc. 62-21↩ might not be entirely accurate for the instant case.