ANDREW MORRIS AND BETTY MORRIS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 88730–88733. Filed May 16, 1962.

*Edward C. Cazier, Jr., Esq.*, for the petitioners.
*Roger Rhodes, Esq.*, for the respondent.

BRUCE, *Judge:* Respondent has asserted the following deficiencies in income taxes for the taxable year 1957:

DEFICIENCY

| Docket No. | Per statutory notice | Added per amendment to answer | Total deficiency |
|---|---|---|---|
| 88730 | $2,429.43 | $196.78 | $2,626.21 |
| 88731 | 2,110.28 | 155.59 | 2,265.87 |
| 88732 | 3,611.65 | 270.00 | 3,881.65 |
| 88733 | 2,351.44 | 173.89 | 2,525.33 |

[1] Proceedings of the following petitioners are consolidated herewith: Louis Morris and Elaine Morris, Docket No. 88731; Gus Morris, Docket No. 88732; Nick Morris and Mary Morris, Docket No. 88733.

Certain of the deficiencies asserted in the statutory notices are not contested by petitioners.

The questions for our determination are (1) whether the costs of installing refrigeration equipment on leased premises constituted capital expenses recoverable by petitioners on the same basis as the cost of the equipment, and (2) whether the cost of the equipment installed on leased premises is recoverable by petitioners (as lessee) through amortization over the term of 1 month remaining under the lease in effect at the time of installation or over a 37-month period which includes the term of a renewal lease, or through depreciation over the 11½-year useful life of the equipment.

### FINDINGS OF FACT.

Petitioners, Louis, Gus, Nick, and Andrew Morris,[2] who are equal partners in Morris Brothers Fruit Company, a partnership, sometimes hereinafter referred to as Morris Brothers, filed income tax returns on the cash basis for the taxable year 1957 with the district director of internal revenue, Los Angeles, California. The principal place of business of the partnership was in Los Angeles.

Morris Brothers filed a partnership return of income, reporting for a fiscal year ending February 28, 1957.

Morris Brothers engages in the business of selling and distributing citrus fruit at wholesale in Los Angeles, and since 1929 has conducted its business on premises leased from Los Angeles Union Terminal, Inc., hereinafter sometimes referred to as the terminal company, a wholly owned subsidiary of the Southern Pacific Company. The terminal company and Morris Brothers are unrelated parties. Petitioners and the terminal company are unrelated parties.

The terminal company operates extensive wholesale produce market facilities consisting primarily of buildings and related facilities suitable for selling and storing produce, together with dock facilities for loading and unloading trucks and railroad cars. It leases these market facilities to about 70 wholesale fruit and produce dealers, such as Morris Brothers. The successful operation of the market is dependent upon the concentration in one area of a large number of produce dealers so that buyers may fulfill their requirements in a centralized location.

The premises occupied by Morris Brothers, containing an area of approximately 13,600 square feet, are known as 766 Market Court. Morris Brothers has conducted business at this particular location

---

[2] The wives of Andrew, Louis, and Nick Morris are petitioners herein only by reason of their having filed joint returns for the taxable year 1957 with their respective husbands.

continuously since 1937. Prior to 1937 Morris Brothers occupied other premises leased from the terminal company.

During November and December 1956, Morris Brothers installed on the premises at 766 Market Court refrigeration equipment having a cost of $23,855. In connection with the installation it incurred additional costs in the amounts of $2,298.11 and $2,264.38.

The refrigeration equipment was installed about 1 year after the closing of the Los Angeles Fruit Growers Exchange in late 1955. Prior to the closing of the exchange, wholesale citrus merchants were able to purchase fruit at the exchange, which was located in Los Angeles. This system enabled the wholesaler to acquire the fruit daily for immediate resale to customers without the necessity of storage. Morris Brothers installed the refrigeration equipment so that it could make relatively infrequent trips to the packing houses located at some distance from Los Angeles, purchasing therefrom enough fruit for several days of selling. Refrigeration keeps the fruit from spoiling. Morris Brothers deemed the installation of the refrigeration equipment essential to the continuation of its business. The useful life of the equipment was 11½ years.

At the time this equipment was installed Morris Brothers occupied its premises under a lease agreement expiring December 31, 1956, which contained the following relevant provisions:

(4) All improvements, additions, alterations and repairs which may be made upon or in the said demised premises by said lessee [including the refrigeration equipment], * * * shall be the property of lessor, and shall remain and be surrendered with the said demised premises at the termination of this lease. * * *

* * * * * * *

(16) * * * If the lessee should hold over the term herein created, such holding over shall be construed to be a tenancy from month to month, at treble the monthly rental which shall have been payable at the time immediately prior to when such holding over shall have commenced, * * *

This lease is dated December 23, 1953. It provides for a term of 2 years with an option in the lessee to renew for a period of 1 year from January 1, 1956, to December 31, 1956.

Since 1944 the provisions of all lease agreements between the terminal company and Morris Brothers have been substantially the same, providing for terms of either 3 years, or 2 years with a 1-year renewal option. Since January 1, 1948, every renewal lease agreement has been forwarded by the terminal company to Morris Brothers for signature on a date subsequent to the expiration of the previous lease agreement. The various renewal leases were forwarded to Morris Brothers on the following dates: Lease for the years 1948, 1949, and 1950—January 26, 1948; for the years 1951, 1952, and 1953—January 9, 1951; for the years 1954, 1955, and 1956—January 6, 1954;

for the years 1957, 1958, and 1959—January 8, 1957; and for the years 1960, 1961, and 1962—January 5, 1960.

Between January 1, 1945, and January 1, 1951, the amount of monthly rental paid by Morris Brothers to the terminal company increased from $545.60 to $747.20. From January 1, 1951, until the time of trial, the rent had not increased.

During the years 1957, 1958, and 1959, Morris Brothers occupied the premises under a lease dated December 18, 1956. This lease was approved by the legal department of the terminal company on December 19, 1956, approved by H. J. Walker (on behalf of the lessor) on December 24, 1956, and forwarded to Morris Brothers on January 8, 1957. Morris Brothers returned the lease, with signatures of the four partners, to the terminal company on February 19, 1957. It was then signed by A. F. Mortensen on behalf of the lessor on the same day, February 19, 1957, and forwarded to Southern Pacific Company on February 20, 1957. This lease contained substantially the same provisions as that which expired December 31, 1956.

At the time the equipment was installed by Morris Brothers, Louis Morris, managing partner of Morris Brothers, expected that the terminal company would renew the partnership's lease.

The terminal company took no action during 1956 indicating that it might not continue to renew Morris Brothers' lease.

The terminal company has never refused to renew a lease with any tenant.

Prior to installing the refrigeration equipment, Morris Brothers did not contact the terminal company regarding the question whether the lease would be renewed.

The premises occupied by Morris Brothers were in demand by prospective tenants during all of the relevant periods.

OPINION.

During November and December 1956, petitioners, doing business as Morris Brothers Fruit Company, installed refrigeration equipment on premises which they leased from Los Angeles Union Terminal, Inc. For income tax purposes, the cost of the equipment—$23,855—was amortized over the then-remaining portion of the lease under which the premises were occupied. This lease expired on December 31, 1956. Petitioners incurred costs in connection with installation of the equipment in the amounts of $2,298.11 and $2,264.38, which were classified on the partnership return as repair and maintenance costs, respectively.

In a notice of deficiency respondent disallowed the treatment of the above amounts by petitioners, and asserted that the total cost of the equipment, plus the so-called repair and maintenance costs, should be

amortized over the remaining term of the lease which expired December 31, 1956, plus the 36 months ending December 31, 1959, covered by a new lease executed by petitioners and the lessors in February 1957. By amended answer respondent asserted that the above costs constituted a capital outlay recoverable through depreciation over the life of the refrigeration equipment. The parties have stipulated that the useful life of the equipment was 11½ years.

The so-called repair and maintenance costs constitute a part of the initial cost of the refrigeration equipment and, as such, are to be treated in the same manner as that cost. *Standard Tube Co.*, 6 T.C. 950. Petitioners appear to concede this, as the matter is not argued on brief.

Thus, the sole issue for our consideration is whether the cost of the equipment is to be recovered by petitioners through amortization over the life of the lease which expired on December 31, 1956, or over that period plus the 3-year period of the lease executed in February 1957, or, finally, through depreciation over the 11½-year useful life of the equipment. This issue, as both the petitioners and respondent concede, turns on the question whether there was a reasonable certainty that petitioners' lease would be renewed. Sec. 1.162–11(b), Income Tax Regs.[3] If such a reasonable certainty of renewal existed, then the cost of the equipment is recoverable through depreciation under section 167, I.R.C. 1954.[4] The regulations cited above incorporate the concept, often enunciated by the courts, that where there is an indefinite tenancy, a capital improvement made by the lessee is

---

[3] Sec. 1.162–11 RENTALS.

(b) *Improvements by lessee on lessor's property.* (1) The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. If the estimated useful life in the hands of the taxpayer of the building erected or of the improvements made, determined without regard to the terms of the lease, is longer than the remaining period of the lease, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining in the term of the lease, and such deduction shall be in lieu of a deduction for depreciation. If, on the other hand, the useful life of such buildings or improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, this deduction shall be computed under the provisions of section 167 (relating to depreciation).

(2) If the lessee began improvements on leased property before July 28, 1958, or if the lessee was on such date and at all times thereafter under a binding legal obligation to make such improvements, the matter of spreading the cost of erecting buildings or making permanent improvements over the term of the original lease, together with the renewal period or periods depends upon the facts in the particular case, including the presence or absence of an obligation of renewal and the relationship between the parties. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease, or the cost of improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal. * * * [Examples omitted.]

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

recoverable through depreciation over the useful life of the improvement. See, e.g., *George H. Bowman Co.* v. *Commissioner*, 32 F. 2d 404 (C.A. D.C. 1929), affirming 7 B.T.A. 399.

Whether there was a reasonable certainty of renewal is a factual question to be decided upon the basis of the whole record. *G. W. Van Keppel Company* v. *Commissioner*, 295 F. 2d 767 (C.A. 8, 1961), affirming a Memorandum Opinion of this Court.

We deal first with the question whether the cost of refrigeration equipment is amortizable by petitioners over the term of the lease which expired December 31, 1956. Petitioners argue that the facts are to be viewed as of the time the lease expired, and that at such time there was not a reasonable certainty that the lease would be renewed. We are satisfied, however, that the facts are correctly viewed as of the end of the taxable year involved. See sec. 1.167(b)–0(a), Income Tax Regs. The partnership operated on a fiscal year which ended February 28, 1957. By this date the lease had been renewed for a definite period of 2 years, with an option in the lessee to renew for a third year.[5] Thus, there remained no uncertainty with respect to renewal of the lease.

Moreover, even if the factual situation be viewed as it existed in December 1956, we have no doubt that there then existed a reasonable certainty of renewal. One of the petitioners has testified that he expected the lease would be renewed. There had been no indication from the lessor that the lease might not be renewed. In fact, petitioners appear to have had so little doubt concerning renewal that the lessor was not even contacted concerning the matter prior to installation of more than $25,000 worth of equipment. The proposition that costs of this dimension would have been incurred by petitioners if there had not existed a reasonable certainty that they would have the use of the equipment beyond December 31, 1956, appears to us wholly untenable. *Standard Tube Co., supra.* We are cognizant of petitioners' contention that they would have incurred the expense even for such a short period since it was essential to the continuation of their business. They assert that when the Los Angeles Fruit Growers Exchange closed, it became impossible for them to continue their operation without the installation of refrigeration equipment, and that they valued the ability to stay in business at more than $25,000. The record establishes, however, that petitioners' business continued without refrigeration equipment from the time the exchange was closed in late 1955 until the equipment was installed in November and December 1956. Accordingly, our credulity is unduly taxed

---

[5] Petitioners do not argue that if the cost of the equipment is not recoverable over the period of the lease ending December 31, 1956, it is recoverable over any period ending prior to December 31, 1959.

by the proposition advanced by petitioners that the equipment would have been installed even without a reasonable certainty that the lease would be renewed beyond the period of about 1 month then remaining. Such a conclusion is especially compelling where the lease agreement provides that such improvements by the lessee as are here involved are the property of the lessor and are surrendered at the termination of the lease. Cf. *Kerr-Cochran, Inc.*, 30 T.C. 69.

For all of the above reasons, we are satisfied that there was a reasonable certainty at all times material to this issue that the lease which expired December 31, 1956, would be renewed.

We move, then, to the question whether the cost of the refrigeration equipment is recoverable over the period of 37 months ending December 31, 1959, or over its useful life. Since respondent originally asserted the cost was recoverable over 37 months and raised the contention that the equipment should be depreciated over its useful life only by amended answer, he bears the burden of demonstrating that there existed a reasonable certainty the lease would be renewed for an indefinite period beyond December 31, 1959. It is our conclusion that the record contains ample evidence that there was a reasonable certainty petitioners' lease would be renewed for a period beyond December 31, 1959, and, in fact, that there was a reasonable certainty that the lease would continue for an indefinite period. Thus, respondent's burden is satisfied.

Petitioners had been tenants of the terminal company for some 28 years at the time a lease was executed in February of 1957. They had occupied the same premises since 1937. It appears that their business was successful. Clearly, they had good reason, and, in fact, have testified they had every wish, to continue in business at the same location. Moreover, it appears that the lessor was equally satisfied with the leasing arrangement. The lessor never refused to renew petitioners' lease. In fact, the lessor never refused to renew the lease of any of its 70 tenants in the market. Successful operation of the market facilities depends upon the concentration in that one area of a large number of produce dealers. Because of such concentration, the market is attractive to produce buyers who may fulfill their requirements at a single location. Thus, lessor and lessee have a mutual concern that the produce community be maintained. Such common purpose provides at the least a strong motive for renewal. Cf. *Kerr-Cochran, Inc.*, *supra*, where we stated at pages 78–79 that while the lessee therein had the right to remove any improvements at the termination of the lease, "the most significant fact * * * is the policy of renewal by the lessor railroad so long as the venture is productive of railroad business."

These incentives for renewal are most significant when the pattern of Morris Brothers' tenancy with the terminal company is examined. Petitioners' partnership has rented space from this lessor since 1929. The partnership has conducted its business on the same premises since 1937. Since 1944, the provisions of all lease agreements between the terminal company and Morris Brothers have been substantially the same. Even the timing of renewals has been a persistent factor, for, since January 1, 1948, every renewal lease has been forwarded to Morris Brothers for signature by the lessor on a date subsequent to the expiration of the previous lease agreement. Nor does there appear to be any factor suggested by the record which would make speculative in any significant sense a conclusion that indefinite renewal was reasonably certain. It may be noted, for example, that increases in the monthly rent from $545.60 to $747.20 between January 1, 1945, and January 1, 1951, caused no deviation from the pattern of renewal. The picture is one not only of repeated renewal but of renewal within the context of business exigencies. There is no reason to conclude that comparable changes in the future would have any greater tendency to make renewal less certain. The record is barren of any indications negativing the certainty of renewal. And we need not engage in unfounded conjecture as to possible contingencies, for the test is reasonable, not absolute certainty.

We have concluded upon the basis of the above-outlined pattern of renewal that there existed in 1956 and 1957 a reasonable certainty that the leases here involved would be renewed for an indefinite period. Cf. *Morris Nachman*, 12 T.C. 1204, affd. 191 F. 2d 934 (C.A. 5, 1951). Such a history of renewal distinguishes the instant case from any in which the lease involved is the first between the parties. See, e.g., *Fort Wharf Ice Co.*, 23 T.C. 202.

We note parenthetically that events subsequent to December 31, 1959, which is the date on which the lease entered into in 1957 expired, tend to bear out our conclusion in this matter. A new lease was executed by the parties on January 5, 1960, for the period January 1, 1960, to December 31, 1962.

Because there existed a reasonable certainty that the lease would be renewed, we are satisfied that there existed for tax purposes a tenancy of indefinite duration. Accordingly, we hold that petitioners are not entitled to amortize the costs of the refrigeration equipment over a period ending December 31, 1956, or over a period ending December 31, 1959, but are entitled to a deduction for depreciation of the equipment over the 11½-year useful life thereof. *Standard Tube Co., supra.*

*Decisions will be entered under Rule 50.*