GIUMARRA BROS. FRUIT CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5078–68.    Filed December 10, 1970.

*James F. Childs, Jr.*, and *John J. Barcal*, for the petitioner.
*Stephen W. Simpson*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for its taxable year ending April 30, 1967, in the amount of $8,100.

The only issue for decision is whether petitioner is entitled to amortize $40,000 paid in connection with obtaining additional space under a supplement to a lease over the stated term of the lease and option to renew, or whether the payment was in substance made for an intangible asset with no determinable useful life.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of the State of California in May 1950. Its principal place of business at the time of the filing of the petition in this case was at 734 Market Court, Los Angeles, Calif. Petitioner filed its Federal income tax return for its fiscal year ending April 30, 1967, with the district director of internal revenue at Los Angeles, Calif.

Petitioner is engaged in the business of wholesale distribution of various types of fruits and vegetables in Los Angeles, Calif. Since 1955 it has conducted this business at 734 Market Court on premises leased from the Los Angeles Union Terminal, Inc. (hereinafter referred to as Terminal). Petitioner is known in the trade as a "jobber" and is bonded and licensed.

On December 1, 1965, petitioner executed a lease agreement with Terminal whereby it leased approximately 4,800 square feet of space, consisting of about 2,400 square feet on the main floor, a downstairs basement used as storage, and a mezzanine which contained office space. The first floor was used as a sales area for the display of merchandise for sale to customers. The lease which petitioner executed on December 1, 1965, was for a period of 2 years for a total rental of $10,368,

payable at $432 per month. The lease granted to petitioner the right of renewal for a period of 1 year from December 1, 1967, through November 30, 1968, at a monthly rental to be mutually agreed upon prior to the expiration of the original lease. The lease provided that the leased premises were to be used for "Wholesale Fruit and Produce Business" and for no other use and purpose. The lease provided that it was assignable only with the consent of the lessor and had provisions with respect to fixtures which might be removed at termination of the lease and those which would become the property of the lessor. The lease provided for termination of the lease at the option of the lessor if the lessee failed to keep the premises open for conducting the business permitted by the lease for a period of at least 15 days every month. The lease also provided for termination at the election of the lessor if the lessee became bankrupt or made an assignment for the benefit of creditors.

Terminal is a wholly owned subsidiary of Southern Pacific Co., and operates extensive wholesale produce market facilities owned by its parent in Los Angeles. These facilities consist primarily of buildings suitable for the sale and storage of produce with dock facilities for loading and unloading fruit and produce from trucks or railroad cars. The total area operated by Terminal in the market section is approximately 549,000 square feet. Terminal leases these facilities to various wholesale fruit and produce dealers and in 1967 had approximately 75 such businesses as tenants.

Growers of produce send their commodities to be sold primarily at wholesale by the various produce merchants at the market operated by Terminal and similar markets. Buyers from the various retail stores come daily to these markets to select produce to purchase for resale to their customers. There are three such markets in Los Angeles, the market in which petitioner operated which was known as the Union Terminal Market, the City Market, and the Eighth Street Market. The City Market is larger than the Union Terminal Market and the Eighth Street Market is smaller.

The various market jobbers compete with each other and with brokers who represent individual growers and sell produce directly off the truck to the retail stores. During the period 1960 to 1970 between 8 and 10 firms operating in the Union Terminal Market have become bankrupt. Petitioner sells to grocers ranging in size from a small individually owned store to a large chain store. Samples of the produce are displayed on the floor of the market facility. Sometimes the purchaser will take the produce displayed but often upon assurance that the produce which has not been unloaded is of equal quality will take the produce which has never been unloaded from the truck. Petitioner must, however, display on its floor at least samples of all the produce it is offering for sale.

In the latter part of 1965 petitioner had made a tentative commitment to take on an additional line of commodities subject to being able to obtain the necessary space to display the line. Petitioner was investigating ways to obtain additional space, including the possibility of moving its entire facility, when the company that operated the facilities next door to petitioner's went into bankruptcy. Several companies evidenced an interest in obtaining the space which had become vacant due to the bankruptcy. The receiver of the bankrupt and Terminal took the position that the highest bidder would be allowed to lease the space which had been occupied by the bankrupt. Approximately $40,000 was needed to pay the creditors of the bankrupt and this was the sum the receiver, with the agreement of Terminal, was attempting to obtain from the person to whom the space which had been occupied by the bankrupt would be leased. Because of its need for the space, petitioner offered to pay $40,000 for it and there was no higher bid.

On June 22, 1966, petitioner and Terminal executed a supplement to the lease agreement whereby the 3,200 square feet previously occupied by the bankrupt adjacent to petitioner's leasehold was included in petitioner's leasehold effective as of July 1, 1966, with the monthly rental of petitioner's entire leasehold increased from $432 to $928 per month as of that date. All other provisions of the original lease remained in effect. During June of 1966 petitioner made payments totaling $40,000 in satisfaction of the creditors' claims against the bankrupt former tenant. The $40,000 was capitalized by petitioner on its books. It was not common to pay a premium as high as $40,000 to obtain the amount of space in the Union Terminal Market that petitioner obtained under its supplemental lease of June 22, 1966. However, petitioner's president was of the opinion that petitioner's return on the volume of produce which could be handled through the additional space over a 29-month period would make it profitable for petitioner to pay the $40,000 to acquire the extra space for use for 29 months which was the remaining term of petitioner's lease plus the 1-year renewal provided for therein.

Petitioner's officers at the time of entering into the supplemental lease knew of studies which had been made by City and Federal authorities with respect to a new food distribution center. Petitioner's officers had evidenced an interest in the building of such a facility and from their participation in planning for this facility were of the opinion that it would be available by 1970 or 1971.

By 1966 most of the produce distributed by petitioner was brought in by truck. In 1956 when petitioner first commenced operating in the Union Terminal Market, from 20 to 25 percent of its produce was shipped in by rail. By 1966 only approximately 2 percent of its produce was shipped by rail. Petitioner found shipping in by truck to be

more efficient and economical. The terminal facility could not easily accommodate the amount of truck traffic which had developed by 1966 and accordingly became quite congested in handling the large numbers of heavy tractor-trailers which transferred produce to and from the facilities of petitioner and the other tenants of the market. The Union Terminal Market building had been constructed about 1924. Terminal had allowed the building to become dilapidated and services to tenants had begun to be limited.

At the time the additional space was acquired, petitioner had no assurances from Terminal that its lease would be renewed after the 29-month period composed of the remaining portion of the term and the 1 year for which petitioner had an option to renew.

Shortly after the acquisition of the leaseholder petitioner contracted to have two Carrier automatic refrigerating systems installed in the enlarged leasehold at a total cost, including installation, of $17,230.88. These systems were basically large fans which were not attached to the floors or walls of the building. Petitioner's officers were of the opinion that the refrigeration systems were the property of petitioner which under the terms of the lease could be removed by petitioner anytime prior to the termination of the lease. Petitioner is depreciating this equipment by using an estimated useful life of 8 years.

Petitioner's income for the year prior to and the 3 years subsequent to the purchase of the leasehold was as follows:

| TYE Apr. 30— | Gross income | Taxable income |
| --- | --- | --- |
| 1966 | $373, 605. 38 | $33, 344. 03 |
| 1967 | 518, 823. 79 | [1] 67, 440. 45 |
| 1968 | 650, 472. 24 | [1] 82, 455. 25 |
| 1969 | 882, 953. 40 | 109, 685. 44 |

[1] Computed prior to the $20,000 amortization deduction.

On its Federal income tax return for the taxable year ending April 30, 1967, petitioner claimed as a depreciation deduction amortization of one-half of the $40,000 cost of the leasehold acquired by it in June 1966 or $20,000.

Respondent in his notice of deficiency disallowed this claimed deduction with the following explanation:

It is determined that the allowable depreciation is $12,856.46 rather than $32,856.46 as claimed on your return, because the $40,000 cost of a certain leasehold (one-half of which was deducted in taxable year ended April 30, 1967) is not subject to an amortization deduction in the absence of a determinate period of useful life. Therefore your taxable income is increased by the amount of $20,000.

Petitioner at the trial conceded that it should have amortized the $40,000 over a period of 29 months and that therefore its claimed deduction for its fiscal year 1967 was overstated by the difference between

$20,000 and the $13,793.10 which petitioner now contends to be properly allowable in that year.

OPINION

Petitioner takes the position that the $40,000 which it paid to acquire the additional space under lease from Terminal is amortizable over 29 months, composed of the 17 months of the original term of its lease plus the period of the 1-year renewal option. Petitioner states that a payment to acquire a lease is always considered to be a capital expenditure to acquire an asset of a wasting nature [1] and that the period over which the asset may be amortized is specifically provided for in section 178, I.R.C. 1954.[2]

It is petitioner's position that the amount of amortization allowable as a deduction is properly computable under section 178(a). However petitioner contends that if the amount is to be computed under section 178(c), it would nevertheless follow that the $40,000 should be amortized over a 29-month period.

Respondent's position is not completely clear. At the trial respondent's counsel stated respondent's position as follows:

It is the Government's position that the depreciation as taken on the return of Petitioner's $40,000 cost which was depreciated over the two-year period, either

---

[1] Petitioner calls attention to the provisions of sec. 1.162–11(a), Income Tax Regs., which states:

Sec. 1.162–11 Rentals

(a) *Acquisition of a leasehold.* If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on, the number of years the lease has to run. * * *

[2] All references are to the Internal Revenue Code of 1954.

SEC. 178. DEPRECIATION OR AMORTIZATION OF IMPROVEMENTS MADE BY LESSEE ON LESSOR'S PROPERTY.

(a) GENERAL RULE.—Except as provided in subsection (b) in determining the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

       *       *       *       *       *       *       *

(2) in respect of any cost of acquiring the lease, if less than 75 percent of such cost is attributable to the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining on the date of its acquisition, the term of the lease shall be treated as including any period for which the lease may be renewed, extended, or continued pursuant to an option exercisable by the lessee, unless the lessee establishes that (as of the close of the taxable year) it is more probable that the lease will not be renewed, extended, or continued for such period than that the lease will be so renewed, extended, or continued.

       *       *       *       *       *       *       *

(c) REASONABLE CERTAINTY TEST.—In any case in which neither subsection (a) nor subsection (b) applies, the determination as to the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

    (1) in respect of any building erected (or other improvement made) on the leased property, or

    (2) In respect of any cost of acquiring the lease,

shall be made with reference to the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee), unless the lease has been renewed, extended, or continued or the facts show with reasonable certainty that the lease will be renewed, extended, or continued.

under Section 167, and particularly with respect to regulations 167a3; that it was an intangible asset, and that it had no definite period of life over which it could be amortized.

On the other hand, if it is not considered an intangible asset, but is considered to be the cost of the leasehold or cost incidental to acquiring a leasehold, then it's the Government's position that under Section 178c that there is a reasonable certainty that the lease would be renewed indefinitely.

Respondent's argument on brief is primarily directed to his interpretation of section 178(c). He apparently concedes on brief that the $40,000 was paid to acquire a lease. In any event we hold on the basis of the facts herein that petitioner paid the $40,000 for the acquisition of the leasehold for business purposes.

As we read respondent's argument, he contends that no portion of the $40,000 payment is deductible as depreciation or amortization in the year here in issue, based on section 167 and section 1.167(a)–3, Income Tax Regs., which provide in part that, "An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation."

Section 178(a) and (c) refers to determining the "amount allowable" to a lessee for an amortization deduction. Some of respondent's statements on brief could be interpreted as arguing that section 178 becomes applicable to a taxpayer only after a determination has been made that the payment which that taxpayer seeks to amortize is of a nature which would be depreciable under section 167 of the Code. However, respondent's regulations specifically provide that the term "amortization" means the "deductions allowable * * * for amortization of the cost of acquiring a lease under provisions of the Code such as section 162 or 212 and the regulations thereunder." [3] We therefore assume that respondent intends his argument to be that petitioner has failed to show the amount of deduction to which it would be entitled under section 1.162–11(a), Income Tax Regs. (fn. 1 *supra*), since there was the possibility of petitioner's lease being renewed after its term plus the renewal option period of 1 year.

Respondent relies on such cases as *Andrew Morris*, 38 T.C. 279 (1962), in which we held that there existed "reasonable certainty" that a new lease would be entered into between the lessor and lessee

---

[3] Sec. 1.178–1(a), Income Tax Regs., provides in part as follows:

Sec. 1.178–1. Depreciation or amortization of improvements on leased property and cost of acquiring a lease.

(a) *In general.* Section 178 provides rules for determining the amount of the deduction allowable for any taxable year to a lessee for depreciation or amortization of improvements made on leased property and as amortization of the cost of acquiring a lease. For purposes of section 178 the term "depreciation" means the deduction allowable for exhaustion, wear and tear, or obsolescence under provisions of the Code such as section 167 or 611 and the regulations thereunder and the term "amortization" means the deduction allowable for amortization of buildings or other improvements made on leased property or for amortization of the cost of acquiring a lease under provisions of the Code such as section 162 or 212 and the regulations thereunder. * * *

when the current lease expired. That case involved improvements to a lease made prior to July 28, 1958, the date when section 178 became effective. In the *Morris* case we were concerned with whether improvements installed by the lessee which could not be removed at the termination of the lease should be depreciated over the 11½-year useful life of the equipment installed or over the shorter period of the term of the lease in effect when the equipment was installed. Therefore, our reference in that case to the "reasonable certainty" that the lease would be renewed for an indefinite period referred to an "indefinite period" of at least 11½ years. Here, the $40,000 payment by petitioner has no useful life apart from the lease which petitioner acquired for the payment. Because of this fact, respondent contends that if there existed a "reasonable certainty" that petitioner would enter into a new lease commencing on December 1, 1968, we should allow petitioner no deduction for amortization of the $40,000. While respondent does not specifically so state, he apparently is contending that if there existed "reasonable certainty" that the lease would be renewed on or before December 1, 1968, then the "number of years the lease has to run" referred to in section 1.162–11(a) of his regulations would have to be held to be an "indefinite" period which was not "ascertainable."

While we do not agree with respondent that if we accepted his premise that there existed "reasonable certainty" that petitioner would renew its lease on or before December 1, 1968, we would be required to conclude that the "number of years the lease has to run" was not ascertainable as distinguished from determining from the facts for how many terms or for how long a period it was "reasonably certain" the lease would be renewed, we do not reach this question. We have concluded from the facts herein that the $40,000 was a payment to acquire a lease, and is therefore amortizable under section 1.162–11(a) of respondent's regulations over "the number of years the lease has to run." As we read section 178,[4] the amount of amortization (which is merely another way of stating the "number of years the lease has to run" over which the payment is to be spread) is determinable by that section. In our view, the facts here are such that section 178(a) governs the computation.

Section 178(a) provides that the amount to be deducted as amortization of the cost of acquiring a lease shall be computed in accordance with that section if less than 75 percent of such cost is attributable to

---

[4] The legislative history of sec. 178 clearly shows that it was the intent of Congress to make definite provisions for the period over which payments such as the $40,000 here involved should be deductible and to eliminate the necessity of determining in most instances whether there was "reasonable certainty" that the lease would be renewed, and if so, the number of years for which it would be renewed. See H. Rept. No. 775, 85th Cong., 1st Sess. (1957), 1958–3 C.B. 822, 868, and S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958–3 C.B. 946.

the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed), remaining on the date of its acquisition. Respondent's regulations interpret this section as referring in general to the portion of the acquisition cost which might be considered as applicable to the prime term of the lease as distinguished from any amount which is applicable to the renewal period provided for in the lease.[5] Here the remaining prime term on the lease at the date the additional space was acquired was 17 months and the option to renew was for a period of 1 year. The evidence here shows that petitioner made the payment to acquire the additional space for the entire 29-month period. Therefore under the facts here, the $40,000 is allocable between these two periods on a prorata basis which is $1,379.33 per month or $23,448.61 for the 17-month period and $16,551.96 for the 12-month period. Since $23,448.61 is less than 75 percent of $40,000 it follows that less than 75 percent of the $40,000 should be attributable to the 17-month original term of the lease. However, if we accepted respondent's contention that the $40,000 was paid to acquire the lease for the 17-month period plus the 12-month renewal option period plus an indefinite period of renewal thereafter, it would logically follow that less than 75 percent of the $40,000 was paid for the remaining 17 months of the prime term of the lease. There is therefore no need in this case to resort to any formula. However, computations made under the formula suggested in respondent's regulations also require the conclusion that less than 75 percent of the $40,000 cost of acquiring the lease is attributable to the portion of the original term of the lease remaining on the date of its acquisition.[6] We, therefore, conclude that petitioner is entitled to

---

[5] Sec. 1.178–1(b) (5) (i), Income Tax Regs., provides as follows:

(5) (i) For purposes of section 178(a) (2) and this section, the portion of the cost of acquiring a lease which is attributable to the term of the lease remaining on the date of its acquisition without regard to options exercisable by the lessee to renew, extend, or continue the lease shall be determined on the basis of the facts and circumstances of each case. In some cases, it may be appropriate to determine such portion of the cost of acquiring a lease by applying the principles used to measure the present value of an annuity. Where that method is used, such portion shall be determined by multiplying the cost of the lease by a fraction, the numerator comprised of a factor representing the present value of an annually recurring savings of $1 per year for the period of the remaining term of the lease (without regard to options to renew, extend, or continue the lease) at an appropriate rate of interest (determined on the basis of all the facts and circumstances in each case), and the denominator comprised of a factor representing the present value of $1 per year for the period of the remaining term of the lease including the options to renew, extend, or continue the lease at an appropriate rate of interest.

[6] Sec. 1.178–1(b) (5) (ii) gives the following example:

(ii) The provisions of this subparagraph may be illustrated by the following example:

*Example.* Lessee A acquires a lease with respect to unimproved property at a cost of $100,000 at which time there are 21 years remaining in the original term of the lease with two renewal options of 21 years each. The lease provides for a uniform annual rental for the remaining term of the lease and the renewal periods. It has been determined that this is an appropriate case for the application of the principles used to measure the present value of an annuity. Assume that in this case appropriate rate of interest is 5 percent.

amortize the $40,000 over a 29-month period under section 178(a). Since we conclude that section 178(a) is applicable, it follows that section 178(c) is not applicable since 178(c) applies only if neither 178(a) nor 178(b) is applicable.

*Decision will be entered under Rule 50.*

By applying the tables (Inwood) used to measure the present value of an annuity of $1 per year, the factor representing the present value of $1 per annum for 21 years at 5% is ascertained to be 12.821, and the factor representing the present value of $1 per annum for 63 years at 5% is 19.075. The portion of the cost of the lease ($100,000) attributable to the remaining term of the original lease (21 years) is 67.21% or $67,210 determined as follows:

Applied to this case, the formula would be:

$$\text{Percent of cost attributable to remaining term} = \frac{\text{Present value of annuity of \$1 per year for 17 months (1} \tfrac{5}{12} \text{ years)}}{\text{Present value of annuity of \$1 per year for 29 months (2} \tfrac{5}{12} \text{ years)}}$$

If the 17-month period is used as 1 year and the 29-month period used as 2 years and Inwood's tables at 5 percent are used the result is:

$$\frac{.95238095}{1.85941043} = 51.22 \text{ percent}$$

If the 17-month period is used as 2 years and the 29-month period as 3 years and the same table used, the result is:

$$\frac{1.85941043}{2.72324803} = 68.28 \text{ percent}$$