RAYMOND W. and SHERI J. HODGE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hodge v. Commissioner
Docket Nos. 4319-72, 4320-72, 4321-72, 4322-72, 4323-72, 4324-72.
United States Tax Court
T.C. Memo 1976-341; 1976 Tax Ct. Memo LEXIS 64; 35 T.C.M. (CCH) 1564; T.C.M. (RIA) 760341; November 10, 1976, Filed Robert L. Trimble, for the petitioners. W. John Howard, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies in petitioners' Federal income tax for the taxable year 1969 as follows: Docket No.
Petitioners
Deficiency
4319-72
Raymond W. and Sheri J. Hodge
$16,622.74
4320-72
Calvin W. and Caroline W. White
16,970.83
4321-72
Norman F. Hoffman
7,952.49
4322-72
Hal F. Rachal
11,713.75
4323-72
Alyene E. Hoffman
8,069.38
4324-72
Virginia M. Rachal
11,713.75
*65 Concessions having been made, the sole issue presented for our decision is a determination of the correct period over which the cost of leasehold improvements may be recovered through amortization or depreciation pursuant to sections 162 or 167, respectively.[2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners in docket Nos. 4319-72, 4320-72, 4322-72, and 4324-72 filed Federal income tax returns for the taxable year 1969 with the Internal Revenue Service Center, Austin, Texas, and they resided in Midland, Texas, at the time that they filed their petitions herein. Petitioners in docket Nos. 4321-72 and 4323-72 filed Federal income tax returns for the taxable year 1969 with the Internal Revenue Service Center, Philadelphia, Pennsylvania, and they resided in Alexandria, Virginia, at the time they filed their petition herein. During 1969, petitioners Raymond W. Hodge (hereinafter Hodge), Norman F. Hoffman (hereinafter Hoffman), Calvin W. White (hereinafter White), and Hal F. Rachal (hereinafter Rachal) owned all of the shares of the outstanding *66 capital stock in the corporation, Mooney Southwest, Inc. (formerly West Texas Flying Service, Inc.), which changed its name on November 7, 1969, to Aquila, Inc. (all three corporations hereinafter referred to as Aquila). Aquila validly elected to be subject to the provisions of subchapter S for the taxable year 1969. A small business corporation return (Form 1120-S) was filed on behalf of Aquila for the taxable year 1969.
The four shareholders of Aquila each held 4,950 shares of its capital stock during the year 1969, and they served that corporation as follows: Rachal
Chairman of the Board
Hoffman
President
White
Vice-president
Hodge
Secretary
During 1969, Aquila was in the business of selling executive aircraft, servicing private aircraft at Midland-Odessa Airport (hereinafter Airport) and painting aircraft. Aquila had a production contract on an airplane-by-airplane basis with Mitsubishi Aircraft (hereinafter Mitsubishi) during 1969. Under the Mitsubishi contract, Aquila painted the exterior, upholstered the interior, and installed electronic systems in aircraft which were assembled from subassemblies in San Angelo, Texas, and then flown to Midland, *67 Texas.Aquila earned approximately $20,000 per month from the Mitsubishi business in 1969. On the average, Aquila worked on nine airplanes for Mitsubishi each month, of which it painted approximately six. Painting booths, the leasehold improvements in question, were installed to separate the painting operations from the operations of installing upholstery and electronics equipment. Since the early 1950's Aquila had leased aircraft hangars at the Airport under a series of five-year leases with the city of Midland. On March 11, 1965, Aquila entered into a five-year lease agreement with the city for two aircraft hangars. This lease agreement, which was effective February 1, 1965, and ended on January 31, 1970, expressly permitted Aquila to remove all leasehold improvements upon termination of the lease. On March 12, 1969, Aquila and the city executed a supplemental lease agreement for additional fuel storage tanks located near those hangars then under the five-year lease. The expiration date of the supplemental lease, January 31, 1970, corresponded with the expiration date of the five-year lease. The city wanted Aquila's leasing to coincide for all its facilities, and it was *68 not in the interest of Aquila to have a longer lease on the fuel storage tanks than on the hangars since it was questionable whether the continued leasing of such facilities would be practical if the five-year lease for the hangars was not renewed. A report entitled "Midland-Odessa Regional Air Terminal, 1985 Airport Development Program and Industrial Airpark" (hereinafter Leigh Fisher Report) was prepared by Leigh Fisher Associates, Inc., airport consultants. This report was submitted by the airport consultants to the mayor of the city of Midland in November 1968. The city of Midland has not implemented any part of the plan proposed by the engineers in the Leigh Fisher Report. The Leigh Fisher Report stated that the hangars occupied by Aquila had exceeded their useful life and it recommended that they be removed to provide a site for air cargo facilities. The officers of Aquila were aware of this recommendation at the time they installed the paint booths in March 1969. Aquila intended to extend the lease of the hangars, in which it had installed the paint booths, as long as the city of Midland would agree.However, at such time as the lease of these hangars could no longer *69 be extended because Aquila's continued occupancy would interfere with implementation of the Leigh Fisher plan, then Aquila would not be evicted from the Airport but would have the option of moving to new facilities in another part of the Airport. At such time, Aquila also would have the option of going out of business or moving to facilities in San Angelo, Texas, near the Mitsubishi factory. For the taxable year 1969, Aquila claimed a deduction for maintenance expense in the amount of $34,046.07. In his statutory notice of deficiency, respondent only allowed such claimed deduction to the extent of $22,460.04 on the theory that the excess of $11,586.03 represented capital expenditures for leasehold improvements. The leasehold improvements [3] for which the $11,586.03 was expended consisted of paint booth enclosures installed in one of the leased aircraft hangars during March 1969. These paint booths had walls of herculite, a flexible, fireresistant material, and could be moved in order to allow the airplanes to enter the painting area. Heating and ventilating equipment and custom-fitted duct work were installed as part of the $11,586.03 expenditure in order to keep the area *70 enclosed by the herculite walls sufficiently warm and dust free for painting. As installed, the paint booths would have a useful life of 10 years without regard to the term of any lease to which the leasehold improvements might be subject. During January 1970, Aquila and the city of Midland began negotiations for a new lease of the two aircraft hangars covered by the five-year lease. A one-year lease agreement dated January 27, 1970, was executed by the city and Aquila. Such one-year lease has been renewed annually up to the time of trial. OPINION The sole issue presented for our decision is whether the cost of leasehold improvements made by Aquila, a subchapter S corporation owned by petitioners, should be amortized over the remaining term of a five-year lease, as petitioners contend, or depreciated over the useful lives of the improvements as contended by the respondent. Where the lease term is for a definite period, improvements are generally amortizable over *71 the useful life of the improvement or the remaining period of the lease, whichever is shorter. Sec. 1.162-11(b), Income Tax Regs. However, it is well established that where the tenancy of the lease is for an indefinite period of time, the lessee must depreciate the cost of improvements over their useful lives. Buddy Schoellkopf Products, Inc.,65 T.C. 640 (1975), and cases cited therein. Whether the lease term is of definite or indefinite duration is a question of fact to be determined from all the surrounding facts and circumstances. G. W. Van Keppel Co. v. Commissioner,295 F. 2d 767 (8th Cir. 1961); BuddySchoellkopf Products, Inc.,supra.On the basis of the facts before us, we have concluded that Aquila's lease of the two aircraft hangars was of indefinite duration and, therefore, the paint booths installed therein should be depreciated over their useful lives. Although the period provided for in the lease was a fixed term with no renewal option, it is a fundamental principle of tax law that form must give way to substance and it is clear that the terms of leases may be disregarded under this principle. Highland Hills Swimming Club, Inc. v. Wiseman,272 F. 2d 176 (10th Cir. 1959). *72 Accordingly, a lease is of indefinite duration, regardless of its terms, when the facts show that there is a reasonable certainty that the lessee's occupancy will extend indefinitely beyond the stated period of the lease. [4]Andrew Morris,38 T.C. 279 (1962); Kerr-Cochran, Inc.,30 T.C. 69 (1958); Standard Tube Co.,6 T.C. 950 (1946). Moreover, the facts are correctly viewed at the end of the taxable year involved. Andrew Morris,supra.
It is clear that Aquila intended to continue leasing the hangars for as long as the city gave it the opportunity to do so. Thus, the determinative factual issue is whether there was a reasonable certainty that the city would allow Aquila to occupy the leased hangars for *73 an indefinite period beyond the stated period of the five-year lease. As of December 31, 1969, petitioners' corporation, Aquila, had occupied the aircraft hangars in which the paint booths were installed since the early 1950's under a series of five-year leases. There is no evidence in the record indicating that these prior five-year leases gave Aquila a renewal option, but nevertheless each of these leases was extended at the end of its stated period. Normally, such a history of renewal would strongly indicate that Aquila would continue to occupy the leased hangars after the expiration of the fixed lease term on January 31, 1970. Andrew Morris,supra.
However, a new factor, the recommendation of the Leigh Fisher Report, affected the likelihood of the lease's extension beyond January 31, 1970. Notwithstanding the introduction of the Leigh Fisher recommendation that the hangars leased by Aquila be removed to make way for cargo facilities, the prior history of lease renewal remains a strong indicator that Aquila's occupancy is of indefinite duration. No evidence was presented to indicate that the city would fail to extend Aquila's lease for any reason other *74 than the removal of the leased hangars pursuant to the Leigh Fisher plan. Since no evidence was presented to the contrary and since the history of renewal indicates that the city would renew Aquila's lease but for the Leigh Fisher plan, we conclude that, in the absence of the Leigh Fisher Report, there would be a reasonable certainty that Aquila's lease would be extended indefinitely. Andrew Morris,supra.
We must now consider whether the Leigh Fisher Report raised a sufficient probability of termination so that, as of December 31, 1969, there was no longer a reasonable certainty that Aquila's lease would be extended beyond January 31, 1970. We do not believe that it did. At this point, we must stress that the crucial issue is whether it is reasonably certain that the lease would be extended for an indefinite and indeterminate period beyond January 31, 1970, and not whether it is reasonably certain that the city would agree to enter into another five-year lease with Aquila. Geo. H. Bowman Co.,7 B.T.A. 399 (1927), affd. 32 F. 2d 404 (D.C. Cir. 1929). Petitioner White testified that city representatives had told him *75 in 1969 "that they didn't know what they were going to do in 1970, because of the master plan," and petitioner Rachal testified that the city manager had told him in 1969 "that they were not interested in renewing the lease" because "they were planning on implementing that [Leigh Fisher Report] at whatever date feasible." Aside from the fact that these self-serving statements were not corroborated by the testimony of any city representatives, these statements are ambiguous.They could mean either that (1) the city would not enter into another five-year lease with Aquila but that they would still allow Aquila to occupy the two hangars after January 31, 1970, pursuant to a shorter lease or a tenancy at will, or that (2) the city would not allow Aquila to remain in the two hangars under any arrangement whatever after the expiration of the five-year lease. We are convinced that the first interpretation is more reasonable. As indicated above, there is no evidence in the record that the city wished to terminate Aquila's occupancy before such termination was necessitated by airport development. Moreover, we find it highly unlikely that the implementation of the Leigh Fisher plan would *76 require Aquila to vacate the hangars on January 31, 1970, or shortly thereafter. The evidence is conflicting as to whether the Leigh Fisher plan had even been adopted by the city during 1969. The record is silent as to whether any funds had been appropriated during 1969 for the implementation of such plan, but it is unlikely that such an appropriation had been made, for the city had not yet begun to implement the plan at the time of the trial in this case. Furthermore, Aquila apparently believed that its lease with the city would be extended because the record does not show that it made any effort to negotiate a lease for hangars in which it might continue its business, including the painting of airplanes for Mitsubishi, until less than one month before the expiration date of the five-year lease on January 31, 1970. [5] Finally, with less than one month to run on its current lease, Aquila began negotiations with the city which led to the signing of a one-year lease. In addition to the history of renewal, an investment of over $11,000, made at a time when the stated lease term was to expire in 10 months, indicates *77 that Aquila believed there was a reasonable certainty that its occupancy of the leased hangars would continue indefinitely. Highland Hills Swimming Club, Inc. v. Wiseman,supra;Andrew Morris,supra. Petitioners argue that this substantial investment was necessary to keep the Mitsubishi business, from which Aquila netted approximately $20,000 per month, so that, in this instance, sound business judgment dictated making such a substantial investment for such a short time period. In Andrew Morris,supra, petitioner made a similar argument which we rejected because the conditions which allegedly necessitated the investment had existed for over a year before the investment was made. A similar contention was rejected in James L. Stinnett, Jr.,54 T.C. 221 (1970). Likewise, in the instant case, we cannot accept petitioners' argument to ignore the substantiality of such a purportedly short-term investment because the record does not show at what date the Mitsubishi business grew to the point where paint booths were "necessary." Petitioners have not introduced sufficient evidence to refute the inference of indefiniteness *78 which arises when a substantial investment is made near the end of the lease term. Therefore, we hold that at the end of the taxable year 1969, it was reasonably certain that Aquila would be allowed to remain on the leased premises indefinitely after the termination of the five-year lease. Consequently, the paint booths must be depreciated over their useful life which has been stipulated to be 10 years. James L. Stinnett, Jr.,supra.
Because of concessions, Decision will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Calvin W. White and Caroline W. White, docket No. 4320-72; Norman F. Hoffman, docket No. 4321-72; Hal F. Rachal, docket No. 4322-72; Alyene E. Hoffman, docket No. 4323-72; and Virginia M. Rachal, docket No. 4324-72.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
3. Although petitioners originally deducted the cost of the paint booths as a maintenance expense, petitioners abandoned this contention on brief and assumed that the paint booths were leasehold improvements.↩
4. Neither party has argued that section 178 is applicable and we do not believe that it is since the facts here indicate that the lease term is of indefinite duration. G. W. Van Keppel Co. v. Commissioner,295 F. 2d 767 (8th Cir. 1961); Buddy Schoellkopf Products, Inc.,65 T.C. 640↩ (1975). However, if we decided the issue under section 178 the result would be the same.
5. Wayside Furniture Co.,T.C. Memo. 1967-59↩.